**In re the Minor Child C.D.G.D.,
born September 20, 2008.**

**Roxanne Marie Givens, third party
petitioner, Respondent,**

v.

**Anthony Michael Darst, Appellant.**

**No. A10–1129.**

Court of Appeals of Minnesota.

June 20, 2011.

Alan C. Eidsness, Melissa J. Nilsson, Henson & Efron, P.A., Minneapolis, MN, for respondent.

John R. Hill, Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, MN, for appellant.

Considered and decided by CONNOLLY, Presiding Judge; JOHNSON, Chief Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

Anthony Darst, father, appeals from the district court's order granting substantial visitation rights to his son's maternal grandmother, Roxanne Givens, following the murder of the child's mother. The district court granted Givens visitation every Tuesday and Thursday afternoon and every other weekend extended from Friday evening through Sunday evening. The district court's visitation order treats the grandmother essentially as a noncustodial parent and imposes a schedule that on its face interferes with the father's parent-child relationship. And the district court failed to apply the constitutionally required burden and standard of proof. The district court therefore abused its discretion and we reverse.

## FACTS

Roxanne Givens's daughter was unmarried and living with Givens at home when she gave birth to C.D.G.D. in September 2008. Although C.D.G.D.'s birth certificate did not designate a father, his mother recognized Anthony Darst as the boy's father and gave him Darst's surname. Genetic testing completed in October con-firmed Darst as the father, and in a signed and notarized agreement the mother expressly attempted to acknowledge Darst as having "all legal rights as the father." She also agreed in that document that Darst would have liberal parenting time with C.D.G.D., specifically stating that Darst could see C.D.G.D. every day, could have him overnight at least two nights weekly, and could "take [C.D.G.D.] on all of his days off from work." She and C.D.G.D. continued to live with Givens for approximately the first four months of C.D.G.D.'s life, until a man she had previously dated murdered her in January 2009.

Less than two weeks after her daughter's murder, on February 6 Givens petitioned the district court ex parte to become C.D.G.D.'s "sole legal and sole physical" custodian. Her petition, filed without notice to Darst, stated only that Darst "may be" C.D.G.D.'s father. The district court immediately ordered that Givens be designated as C.D.G.D.'s temporary legal and physical custodian. Darst learned of the order, and within one week he served Givens with his petition for judgment of paternity so that he could secure his paternal right to sole legal and physical custody. Three weeks later he filed the petition with the district court.[1]

The district court consolidated the two competing custody petitions in a single case but it took some time before ruling. It did not adjudicate Darst as father until May 2009, and when it did, it expressly left in force its February order granting Givens temporary legal and physical custody of C.D.G.D. It did not conduct a hearing on custody until July 2009, and it did not decide custody until November 9, 2009.

---

1. We refer only to the "district court" throughout this opinion. The decisions in this case were made by a judicial referee and then adopted by district court judges, and for convenience only we make no distinction. *See* Minn.Stat. § 484.65, subd. 10 (2010).

The district court then dismissed Givens's custody petition, effectively removing the only impediment to Darst's right to custody as C.D.G.D.'s only living parent.

During the period between the parties' February custody petitions and the district court's November custody decision, C.D.G.D. continued to live with his grandmother under the February temporary order. According to Darst, during that period Givens allowed him only tightly restricted opportunities to see the child, primarily under Givens's supervision in her home. That changed radically once the district court effectively granted Darst custody of C.D.G.D. in November 2009; according to Givens, Darst then did not allow her to see the child. Darst and Givens have an unfriendly, antagonistic relationship.

In February 2010, Givens petitioned for grandparent visitation under Minnesota Statutes section 257C.08. She proposed a schedule that would have given her time with C.D.G.D. on all or part of five days out of every calendar week: every Tuesday and Thursday afternoon and every full weekend from Friday evening to Sunday evening, plus holidays and vacation time. Darst agreed that C.D.G.D. should have some time with Givens, offering grandparent visitation of one weekend each month from Saturday morning to Sunday evening. He also agreed that some holiday visitation should occur, but he urged that it should be left unspecified, allowing the parties to work together periodically for holiday arrangements.

The district court awarded the following grandparent visitation schedule in periodically increasing amounts:

1. For the first 90 days, every Tuesday . . . from 1:00 p.m. until 5:30 p.m., and every Saturday from 10:00 a.m. until 5:00 p.m.

2. For the second 90 days, every Tuesday and Thursday from 1:00 p.m. until 5:30 p.m., and every Saturday over night from 10:00 a.m. on Saturday until 10 a.m. on Sunday.

3. Following six months, every Tuesday and Thursday from 1:00 p.m. until 5:30 p.m., and every other weekend from Friday at 5:00 p.m. until Sunday at 5:00 p.m.

Darst appeals.

## ISSUE

Did the district court abuse its discretion in its analysis or decision when it ordered grandparent visitation?

## ANALYSIS

Darst challenges the district court's grandparent visitation order. We agree that infirmities in the district court's analysis and decision require that the order be reversed and the matter remanded for the district court to order visitation that does not interfere with Darst's parent-child relationship with his son.

A parent has the fundamental right to make parenting decisions, including deciding who spends time with the child. That right has long been recognized in the common law and is constitutionally protected. *See Olson v. Olson,* 534 N.W.2d 547, 549 (Minn.1995) (citing common-law precedent and observing that "[h]istorically, grandparents had virtually no legal right to maintain a relationship with a grandchild independent of the wishes of the child's parents"); *Troxel v. Granville,* 530 U.S. 57, 66–68, 120 S.Ct. 2054, 2060–61, 147 L.Ed.2d 49 (2000) (plurality) (holding that grandparent visitation must satisfy the due process protection in the fundamental right of parents to make decisions concerning the care, custody, and control of their children); *SooHoo v. Johnson,* 731 N.W.2d 815, 821 (Minn.2007) ("[A] parent's

right to make decisions concerning the care, custody, and control of his or her children is a protected fundamental right.").

■ A grandparent of a child whose parent is deceased may by statute nevertheless petition the district court for visitation. Minn.Stat. § 257C.08, subd. 1 (2010). And the district court may in its discretion grant the petition even against the surviving parent's wishes, but only if the visitation does not interfere with the parent's relationship with the child:

> If a parent of an unmarried minor child is deceased, the parents ... of the deceased parent may be granted reasonable visitation rights to the unmarried minor child during minority by the district court upon finding that visitation rights would be in the best interests of the child and would not interfere with the parent child relationship.

*Id.* In contemplating whether to grant a grandparent's visitation petition, the district court "shall consider the amount of personal contact between the parents ... of the deceased parent and the child prior to the application." *Id.* And to avoid an unconstitutional intrusion into the parental due process right to make child-rearing associational decisions, the grandparent must prove by clear and convincing evidence that visitation would not interfere with the parent-child relationship. *Cf. SooHoo,* 731 N.W.2d at 823 (requiring third party to prove by clear and convincing evidence that visitation rights would not interfere with the parent-child relationship).

Darst contends that the nature and amount of visitation ordered here exceeds the discretion allowed by statute. He maintains that the order essentially establishes a parenting-time schedule rather than grandparent visitation and that it interferes with his relationship with his son.

He also contends that the district court applied the wrong standard. His contentions are well taken.

Our concerns about the district court's order arise from its reasoning and its decision as to the amount of visitation granted. The concerns lead us to five independent grounds to reverse.

### Prior Contact between Grandparent and Child

■ The district court appropriately reasoned that deciding whether to grant grandparent visitation and, if so, how much to grant, required it first to consider "previous personal contact" that Givens had experienced with C.D.G.D. before she filed her visitation petition. *See* Minn.Stat. § 257C.08, subd. 1. The district court did look to that prior contact. But we conclude that it abused its discretion by relying on its stated finding that, "following Mother's murder, Grandmother functioned as the child's primary caretaker" and developed a substantial bond with him, without addressing the circumstances that put Givens in the primary caretaking role.

■ We think it significant that Givens was serving in the primary caretaking role under circumstances that raise legitimate questions about encroachment into the father's and child's rights and interests in maintaining the father-child bond. This is significant because we believe that the amount of time Givens spent with C.D.G.D. while serving in that role should be applied to support her visitation petition only to the extent it is equitable to do so. *Cf. In re Welfare of Brennan,* 270 Minn. 455, 464, 134 N.W.2d 126, 132 (1965) (holding that unwed father should be given an opportunity to argue for custody of child noting that such "proceedings are in the nature of an equitable action to establish respondent's status as the father of the child and his right to have notice of

proceedings taken with reference to the adoption of the child"). Although grandparent visitation arises from statute rather than common law, the district court acts within its discretion when ordering grandparent visitation only if it addresses the potentially inequitable circumstances surrounding the caretaking role that is the primary support for its visitation order.

Darst reasonably maintains that, but for circumstances that should not be applied against him, he would likely have been serving in the primary caregiving role from almost the moment of the murder. Darst explained to the district court that he had returned from California to be present at C.D.G.D.'s birth and that, until the mother's death, he spent virtually every day with C.D.G.D. He was positively confirmed to be the father by genetic testing completed only 17 days after the child's delivery and agreed with the mother in writing that he is the child's biological and "legal father." Darst put it this way in unrebutted affidavit testimony:

> Prior to [C.D.G.D.'s] birth, Brittany and I had renewed our relationship. I returned to Minnesota before [C.D.G.D.] was born so I could witness his birth in the hospital. Brittany and I agreed to hyphenate [C.D.G.D.'s] last name to include my last name. I spent some part of *every day* following his birth with [C.D.G.D.], sometimes together with Brittany and sometimes alone. I was with [C.D.G.D.] when he had his first immunization shots on November 24, 2008.... The days after Christmas 2008, when Brittany took [C.D.G.D.] to St. Maarten on vacation with her family, were the only days since his birth where I did not see [C.D.G.D.].

Only after the mother's death did this arrangement change, and the circumstances of that change include arguably inequitable circumstances that the district court should have addressed before relying on the change as the basis to increase Givens's time with C.D.G.D. by decreasing Darst's.

Givens sought and obtained an *ex parte* order for custody within days of the murder even though her daughter and Darst had recognized Darst as father since birth. The district court's eventual custody order does not *expressly* find that Givens knew of the genetic match between Darst and C.D.G.D. and that she feigned uncertainty to justify excluding Darst from the initial custody proceeding, but the finding is strongly implied. The district court observed that "the sole reason [Givens] obtained temporary custody was through an ex parte order, for which she provided no notice to [Darst]." It then questioned Givens's credibility concerning her custody-acquiring litigation: "Though [Givens] claims that [Darst] was not entitled to notice, the Court is not persuaded that [her] doubt of [Darst's] parentage surfacing at the time she requested ex parte relief is merely coincidental." It also found that Givens knew "that [Darst] has been involved in the child's life since birth." By claiming that she was unsure that Darst was C.D.G.D.'s father and not informing Darst of the *ex parte* custody proceeding, Givens effectively secured a proceeding at which Darst would not be present to make his easily provable claim of parentage. This allowed her to become primary custodian, which led to her having a substantial amount of time with C.D.G.D., which in turn constituted her only support for the expansive visitation that the district court ordered. Although Givens disclosed that Darst "may be" the father, under the circumstances and the district court's findings, we see persuasive support for Darst's contention that Givens's appointment as custodian resulted substantially from her engaging in procedural maneuvering.

Adding to our concerns about the manner in which Givens obtained custody, that custody continued for months even after Darst's paternity judgment. Almost immediately after Givens secured her custody order, Darst asserted his parental rights by petitioning for paternity and advising the district court expressly that genetic testing had already confirmed his fatherhood and that he and the mother had together been C.D.G.D.'s primary caregivers. Despite those apparently undisputed assertions leading to Darst's eventual paternity judgment, without explanation for its reasons the district court left in place its order that had granted temporary legal and physical custody to Givens. That temporary custody decision survived not only the three months from Darst's uncontested paternity petition to the May 2009 paternity judgment, but it also remained in place until the district court's November 2009 order dismissing Givens's custody petition, which the district court deemed to have been unfounded. We assume that some bases for this lengthy delay must exist, and portions of it seem to be based on settlement negotiations and substitution of counsel. But we are persuaded by Darst's contention that, under these circumstances, it was unfair to rely on the delay as the primary basis for the extraordinary grandparent visitation ordered.

We do not suggest that the district court should have disregarded the statutory requirement to consider the amount of time Givens had experienced with the child before she filed her visitation petition. *See* Minn.Stat. 257C.08, subd. 1. We also do not suggest that Givens acted contrary to law by taking the procedural steps she took. We say only that the district court should have considered the amount of time in a manner that adequately accounted for the circumstances and method used to obtain it, for Darst's prompt efforts to correct it, and for the child's substantial interest in having the custody rights of his only surviving parent recognized and enforced at the earliest opportunity.[2] In our view, the district court abused its discretion by basing the expansive grandparent visitation decision principally on the consequences of the long delay in deciding custody in Darst's favor.

### Treatment of Grandparent Essentially as Noncustodial Parent

▆▆ We conclude also that the district court applied the wrong standard for determining visitation. It did so by treating Givens more like a parent than a grandparent. For example, the district court contemplated whether Givens could provide for C.D.G.D. in ways that Darst could not. It also emphasized that Givens "has the capacity and disposition ... to continue educating and raising the child in his culture." These are factors that bear appropriately on custody contests between two parents or guardians who each have the right to decide how to best provide for the child's cultural and other needs. The district court's framing of the analysis in this way supports Darst's argument that it based its decision on an inflated understanding of the grandparent role.

The district court also made its schedule expressly relying on the supreme court's

2. This is not a case in which a time-intensive factual question about paternity or parental fitness or child endangerment reasonably delayed the custody decision; in such a circumstance, we could not so easily say that the district court abused its discretion by relying so heavily on the amount of grandparent contact occasioned by the delay. Here the district court needed no oral testimony, relied on affidavits submitted at least five months earlier, and had no apparent difficulty concluding in November 2009 that Givens "ha[d] not made allegations in her Petition or supporting affidavits to support a finding" of any of her claimed grounds for custody.

pamphlet, "A Parental Guide to Making Child–Focused Parenting Time Decisions." The district court acknowledged that this guide was designed for parenting-time decisions, not for grandparent visitation decisions. But it reasoned that the guide should nevertheless apply here because "it has proven helpful in application to paternity proceedings, even when the parents did not have a significant relationship prior to or after the birth of a child, and it also has important information" regarding child development. The district court decided on its schedule by relying on that parenting time guide (though "[not] in a rote manner"). Givens had urged the court to base its schedule on the guide, and the district court largely adopted the structure of her proposed schedule.

The record reflects that the parenting-time guide was significant to the district court's reasoning. The guide rests on the implicit understanding that children have a similar interest in a balanced relationship with each *parent*. And when the district court explained that it was not applying the parenting-time guide in rote fashion, it stated that it was doing so because of acrimony between Darst and Givens; in other words, it did not depart from the guide because of the material dissimilarity between the parent-child relationship and the grandparent-child relationship. The district court's analysis suggests instead, as Darst argues, an approach that elevated Givens's position as grandparent to Darst's position as parent. The grandparent visitation provisions of the statute do not contemplate use of a parenting-time standard to determine grandparent visitation. And the common-law priority favoring parents over all others in deciding their children's associations is reflected in the statutory prohibition against grandparent visitation that interferes with the parent-child relationship. That priority was not reflected in the district court's reasoning, and we

hold that the district court abused its discretion by treating Givens as a parent.

### Quantity and Structure of Visitation Schedule

■ The district court's conclusion is also quantitatively flawed. By treating the child's interest in spending time with his grandmother as qualitatively similar to his interest in spending time with his father, it ordered too much visitation. The grandparent visitation statute prohibits a district court from ordering grandparent visitation that interferes with the parent-child relationship. *See* Minn.Stat. § 257C.08, subd. 1. The statute does not expressly draw the line between a permissible grant of grandparent visitation time and an impermissible grant that cuts into the parent's relationship. Without attempting to define that line, we are convinced that the district court's decision crosses it.

The visitation order is excessive. It requires that C.D.G.D. will spend some part of 182 days every calendar year with his grandmother; that's one half the days in each year and 52 overnights. It requires that father and grandmother must equally divide the year's full weekends, from Friday evening to Sunday evening. It includes no holiday allocations, so it implies that C.D.G.D. will spend every Thanksgiving afternoon with his grandmother. It therefore also implies that she will have C.D.G.D. on some of his birthdays, some of Darst's birthdays, many entire Father's Days—every holiday or special occasion that happens to fall on one of Givens's many scheduled days. And it appears that, without Givens's permission, Darst could not take C.D.G.D. on any trip longer than four days. To the extent parenting rights include the opportunity to consistently participate with the child in religious meetings, which often occur on a fixed weekend day, Darst could not so

engage with C.D.G.D. The weekend ordinarily includes other regular events that may be central to a child's healthy upbringing and consistent parental participation, including athletics, theater, music, recreation, travel, and scholastic projects. The schedule would complicate any of these activities. And despite the deep and open acrimony that infests the relationship between Givens and Darst—complete with mutual hate-filled, profanity-laden exchanges and custody-related accusations— over Darst's objection, the order imposes 10 transfers between them during every 14-day period.

This sort of hopscotch calendar may sometimes be the best solution to accommodate equal and competing parental rights between unmarried or divorced parents who have demonstrated a capacity to engage civilly. But it cannot be imposed to satisfy the limited rights of grandparents without interfering with the parent-child relationship. It is impossible for us to imagine that the legislature contemplated this sort of expansive schedule when it carved the grandparent-visitation exception out of the common-law rule that parents may prohibit their child's association with others. The statute contemplates only intergenerational *contact*, providing children "the opportunity to know their grandparents," *Olson*, 534 N.W.2d at 550, and we are guided by its express restriction prohibiting courts from ordering grandparent visitation that interferes with the parent-child relationship. We do not overlook the district court's stated finding that its schedule "will not interfere with the father child relationship." But we hold that the finding is clearly erroneous. It is merely conclusory, lacking persuasive rationale and supporting facts. And it cannot be squared with the visitation schedule's inherently intrusive nature.

■ The visitation ordered here is unprecedented in scale and design by comparison to all other precedential grandparent-visitation cases. In *Olson*, the supreme court reversed this court to uphold a district court's order granting grandparent visitation of one weekday per week. 534 N.W.2d at 548 n. 2, 551. In *Gray v. Hauschildt*, we affirmed an order for monthly, two-day, single-overnight grandparent visitation. 528 N.W.2d 271, 274 (Minn.App.1995). In *Foster ex rel. J.B. v. Brooks*, we affirmed the district court's reduction of maternal grandparent visitation from a share of the father's parental visitation time to one Sunday each month. 546 N.W.2d 52, 53–54 (Minn.App.1996). And in *Rohmiller v. Hart*, we recently held nonexcessive a grandparent-visitation order of one weekend each month. 799 N.W.2d 612, 615–16 (Minn.App.2011). No Minnesota published opinion contemplates grandparent visitation anywhere near the amount ordered here.[3]

We are not convinced by Givens's argument that the supreme court has already decided this "exact issue" in her favor, citing *SooHoo v. Johnson*. See 731 N.W.2d at 826 (affirming the district court's third-party visitation schedule that arguably mirrors a schedule between two parents). The *SooHoo* court affirmed as nonexcessive a visitation schedule that accounted for 37% of the children's time. But that case involved a visitation order in favor of a woman who had separated from

---

**3.** Although our unpublished opinions carry no precedential value, we have reviewed them also. And we note that they similarly reflect no circumstance in which we have affirmed grandparent visitation as expansive as the district court's order. *But see Warmuth v. Koski,* No. A07–1350, 2008 WL 4224470, at *4 (Minn.App. Sep. 16, 2008) (reversing visitation order on other grounds but noting that grandparent visitation of every other weekend and other days was not an abuse of discretion on that record).

her same-sex partner after spending seven years co-parenting her partner's adopted children as her own. It was not a contest between a parent and a grandparent, as here, but a dispute between two women who "co-parented the children, recognized themselves as a family unit with two mothers, and represented themselves to others as such." *Id.* at 818. The children referred to the petitioner as "mommy" and to her parents as their grandparents. *Id.* at 819. In affirming, the *SooHoo* court relied on the separate provision of the statute that allows visitation for persons who have a parent-child relationship and who resided with the child for at least two years. *Id.; see* Minn.Stat. § 257C.08, subd. 4 (2010). Our opinion today and our distinguishing of *SooHoo* was foreshadowed by a concurring opinion highlighting that the result there turned on the case's unique facts, cautioning that "a reflexive award of visitation to a third party that mirrors an award of visitation more typically granted to a non-custodial parent might very well constitute an abuse of discretion." *SooHoo,* 731 N.W.2d at 827 (J. Anderson, G. Barry, concurring).

### Burden and Standard of Proof

Even if the district court had not improperly treated the grandparent essentially as a noncustodial parent in its analysis, and even if the order were not facially infirm by imposing an objectively intrusive schedule, we would still reverse because the district court failed to apply the required burden and standard of proof. We first address the weight that the district court was obligated to apply to Darst's determination that C.D.G.D. should have one full weekend visit monthly with his grandmother. Then we address the weight of the evidence presented concerning whether the visitation ordered does not interfere with Darst's relationship with his son.

### Presumptive Validity of Parental Determination

A plurality of the Supreme Court emphasized in *Troxel* that "if a fit parent's decision [regarding the amount and structure of grandparent visitation to be allowed] becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." 530 U.S. at 70, 120 S.Ct. at 2062. Our supreme court in *SooHoo* echoed this requirement, explaining that "[t]he parent's fundamental right to the care, custody, and control of his or her child carries with it the presumption that the parent is acting in the best interest of the child and requires deference to the parent's wishes." 731 N.W.2d at 824. The district court must give effect to this requirement. For example, in *SooHoo* the supreme court determined that the district court had appropriately "giv[en] special weight to [the custodial parent's] wishes regarding visitation." *Id.* at 825. Although the supreme court made this observation in its analysis of whether the visitation ordered in that case violated the parent's constitutional rights rather than in its analysis of whether the district court abused its discretion in the amount of visitation afforded, it is clear that the requirement exists in all cases and applies both to determine constitutionality and to frame the extent of the district court's discretion concerning the amount of visitation it may order.

■ We must therefore decide whether the district court gave sufficient weight to Darst's presumptively valid wishes regarding visitation. We hold that it did not. The district court did observe that "Father opposes Grandmother's request and instead proposes Grandmother has visitation one weekend per month from Saturday morning until 7:00 p.m. on Sunday." But the district court did not mention Darst's additional offer of visitation around holi-

days, to be agreed upon by the parties apparently on an event-by-event basis. And more problematic, aside from once mentioning Darst's wishes, the district court's discussion does nothing to indicate that it gave those wishes any weight at all, let alone the *"special* weight" and "deference" required as a matter of a parent's fundamental, constitutionally protected right to direct the care, custody, and control of his child. The visitation order discusses many other concerns, but it says nothing more of Darst's preference, let alone any persuasive basis for disregarding it. Unlike the supreme court's assessment in *SooHoo,* we have no basis on this record to say that the district court has "giv[en] special weight to [the custodial parent's] wishes regarding visitation." *Id.* This independently reflects an abuse of discretion and requires reversal.

*Clear and Convincing Evidence of Noninterference*

■ We turn finally to the sufficiency of the evidence that Givens cites to prove that the visitation ordered does not interfere with Darst's parent-child relationship with C.D.G.D. Darst erroneously suggests that the district court should have applied a strict-scrutiny standard before awarding visitation against his preference. Although Givens accurately explains that the strict-scrutiny test is applied only to measure the constitutionality of a nonparent visitation statute, *see Troxel,* 530 U.S. at 66, 120 S.Ct. at 2060, she overemphasizes the district court's substantial discretion in *custody and visitation decisions.* Although the district court is generally imbued with broad discretionary authority to decide visitation, when it comes to third-party visitation, the bounds of that authority include the constitutionally required standard of proof. The supreme court has most recently clarified that "in order to afford due deference to the fit custodial parent," the

third-party visitation seeker has the burden to prove by "clear and convincing evidence" the statutory element that the visitation will not interfere with the custodial parent's relationship with the child. *Soo-Hoo,* 731 N.W.2d at 823.

We have considered Givens's contentions on appeal, and she does not mention her burden to prove noninterference with "clear and convincing evidence." And her brief does not identify any evidence before the district court—let alone clear and convincing evidence—tending to prove that the visitation amount and structure would not interfere with Darst's parent-child relationship. She does assert that she has never disparaged Darst in front of the child, but this does not address our concern and Darst's argument that the visitation interferes with the parent-child relationship. The district court's order similarly does not identify any evidence that the visitation will not interfere with the custodial parent's relationship with the child. We have also carefully examined the record, and it does not include clear and convincing evidence that the visitation ordered will not interfere with Darst's relationship with C.D.G.D. We hold that the district court abused its discretion by ordering visitation without clear and convincing proof that the visitation requested or actually ordered will not interfere with the parent-child relationship. This holding also independently requires reversal.

**DECISION**

Because the district court equated the grandmother's interest essentially to that of a noncustodial parent's, and because it failed to apply the required presumptions and burdens and awarded grandparent visitation in an amount and character that interferes with the parent-child relationship, it abused its discretion. We predict

on this record that remanding for additional extensive argument and a new hearing and further analysis would do little more than to prolong and intensify this now two-and-a-half-year acrimonious contest over time with C.D.G.D. Darst conceded the appropriateness of a visitation schedule including one overnight weekend each month. That schedule is consistent with the grandparent visitation orders that have been affirmed on appeal in our published caselaw, cited above. He also acknowledged the appropriateness of grandparent visitation around major holidays. We therefore reverse the district court's visitation order and remand with instructions to issue an amended order adopting Darst's proposed schedule with variations to accommodate visitation on or near significant holidays, within the district court's discretion. And we remind the parties that the limits of the law and the specific terms of judicially ordered visitation are no substitute for flexibility and cooperative arrangements in the child's best interests: "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren." *Troxel,* 530 U.S. at 70, 120 S.Ct. at 2062.

**Reversed and remanded.**