# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP2105-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>    Plaintiff-Respondent,<br>  v.<br>Michael Gene Wiskowski,<br>    Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | June 18, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 24, 2024 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Sheboygan |
| JUDGE: | Kent R. Hoffmann |

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. HAGEDORN, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined with respect to ¶¶39-75, and PROTASIEWICZ, J., joined with respect to ¶¶72 and 74-75. PROTASIEWICZ, J., filed a concurring opinion, in which ANN WALSH BRADLEY, J., joined. ZIEGLER, C.J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Kirk B. Obear*, and *Birdsall Obear & Associates*, *Sheboygan*. There was an oral argument by *Kirk B. Obear*.

For the plaintiff-respondent, there was a brief filed by *Michael J. Conway*, assistant attorney general, with whom on the

brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Michael J. Conway,* assistant attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2021AP2105-CR
(L.C. No. 2019CF628)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent,

**FILED**

    v.

**JUN 18, 2024**

Michael Gene Wiskowski,

    Defendant-Appellant-Petitioner.

Samuel A. Christensen
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. HAGEDORN, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined with respect to ¶¶39-75, and PROTASIEWICZ, J., joined with respect to ¶¶72 and 74-75. PROTASIEWICZ, J., filed a concurring opinion, in which ANN WALSH BRADLEY, J., joined. ZIEGLER, C.J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 BRIAN HAGEDORN, J. Michael Wiskowski fell asleep in a McDonald's drive-thru lane behind the wheel of his truck. An employee knocked on his window to wake him up and called the police. Officer Devin Simon was about a minute away when he

received a call from dispatch regarding the incident. He headed to the scene and watched a truck matching dispatch's description pull out of the drive-thru and make a proper turn. Officer Simon then pulled Wiskowski over. Wiskowski explained that he was tired because he had just finished a 24-hour shift. Although Officer Simon did not notice any signs of impairment or criminality, he felt something was off, and prolonged the stop to determine whether he had grounds to investigate further. Officer Simon ultimately ordered Wiskowski out of his truck, at which point Wiskowski manifested signs of intoxication, leading to an arrest and charges.

¶2 Wiskowski moved to suppress the evidence discovered during the stop. The circuit court denied the motion, concluding that the stop and further investigation were justified as a permissible "community caretaking function." The court of appeals agreed, and we now reverse. We first conclude the traffic stop was not supported by reasonable suspicion. Furthermore, assuming without deciding that the traffic stop was permissible as a bona fide community caretaking activity, we hold that the stop was prolonged unreasonably when it transformed into an unjustified criminal investigation. The scope of caretaking stops should be guided and limited by the justification for the stop. This means that, absent another permissible reason to detain someone, the detention must end when the original community caretaking justification is resolved.

2

## I. BACKGROUND

¶3    At around 1:00 p.m., while waiting in the drive-thru lane of McDonald's, Michael Wiskowski fell asleep behind the wheel of his truck.  An employee knocked on his truck window to wake him up and called the Plymouth Police Department to report it.  Plymouth Police Officer Devin Simon received word from dispatch about the incident.  When he arrived at McDonald's a minute or so later, he saw a truck matching the caller's description near the end of the drive-thru lane.

¶4    Officer Simon saw Wiskowski exit the drive-thru lane, turn right, stop at a stop sign, and make a "correct, proper, and legal left turn onto the road."  Officer Simon then quickly turned around in the parking lot and briefly followed Wiskowski.  Wiskowski drove normally and did not commit any traffic violations; at no time did his driving appear abnormal or arouse Officer Simon's suspicions.  Officer Simon nonetheless activated his lights and siren and performed a traffic stop.  Wiskowski complied, pulling over into an empty parking lot.

¶5    Officer Simon approached the vehicle, asked Wiskowski about the report that he fell asleep in his truck, and took Wiskowski's driver's license and insurance card.  Wiskowski explained that he had been working for the past 24 hours.  Officer Simon later testified that, up to this point, Wiskowski did not appear sleepy, was not slurring his speech or suffering from any obvious medical issue like a heart attack or seizure, and was otherwise "acting normal."  He also testified that he did not see or smell any alcohol on Wiskowski, nor did he

3

observe any other signs of intoxication. The only behavior Officer Simon characterized as "odd" was that Wiskowski initially gave him an insurance card for the wrong car before handing him the correct one around 20 seconds later.

¶6 Following this initial encounter, Officer Simon returned to his squad car. By this point, a more experienced colleague—Officer Cobalt—had arrived on the scene. Officer Simon told Officer Cobalt what Wiskowski had said about working for 24 hours, and stated that he wanted to get Wiskowski out of his truck. Officer Cobalt asked, "What are you going to pull him out for?" The two conversed further, and Officer Cobalt told Officer Simon to pull up Wiskowski's driving record, which revealed that Wiskowski had three past OWIs. The two officers continued to discuss whether there was "enough to take him out" of the truck and investigate further. Officer Simon said that he would feel better "smelling booze" on Wiskowski before pulling him out. Ultimately, he decided to do so, citing Wiskowski's reported sleepiness and "odd" behavior in handing him two insurance cards. Officer Simon later testified his goal was to see if there was something "going on that maybe [he] wasn't seeing in the car," by which he meant determining whether Wiskowski had been drinking. Approximately five to six minutes transpired after Officer Simon's initial conversation with Wiskowski concluded and when he ordered him out of his truck.

¶7 Once Wiskowski got out of his truck, Officer Simon smelled alcohol for the first time and noticed Wiskowski stumble. Officer Simon asked how much he had to drink, to which

4

Wiskowski replied, "a couple beers."  At that point, Officer Simon took Wiskowski back to the police station to perform field sobriety tests.  Based on his observations during the tests, Officer Simon determined Wiskowski had been driving under the influence of alcohol and arrested him.  The State charged Wiskowski with one count of operating a motor vehicle under the influence and one count of operating with prohibited alcohol concentration, both as fourth offenses.

¶8  Wiskowski moved to suppress the evidence resulting from the traffic stop.  After an evidentiary hearing and briefing, the circuit court[1] denied Wiskowski's motion, finding that Officer Simon's stop was justified as community caretaking activity.  A year later, Wiskowski asked the court to hold another evidentiary hearing to consider bodycam footage that had not been presented to the court the first time around.  The court did so, construing it as a motion to reconsider.  The court once again denied Wiskowski's motion to suppress, continuing to find that Officer Simon "acted reasonably under the community caretaker function."

¶9  Wiskowski eventually pled no contest to one count of operating a motor vehicle under the influence as a fourth offense.  He appealed the judgement of conviction, arguing that the circuit court erred in denying his motion to suppress.  The court of appeals affirmed on the same community caretaking

---

[1] The Honorable Kent Hoffmann of the Sheboygan County Circuit Court presided.

grounds.  State v. Wiskowski, No. 2021AP2105-CR, unpublished order (Wis. Ct. App. Mar. 15, 2023).  Wiskowski then petitioned this court for review.

## II.  DISCUSSION

¶10  Wiskowski argues that Officer Simon's traffic stop was unlawful under the Fourth Amendment, which prohibits "unreasonable searches and seizures."[2]  U.S. Const. amend. IV. He seeks the suppression of evidence obtained against him.[3]  The facts are not in dispute, so this is a question of law we review independently.  State v. Genous, 2021 WI 50, ¶10, 397 Wis. 2d 293, 961 N.W.2d 41.

¶11 The State contends the stop was lawful for two independent reasons.  First, the State maintains it was a permissible investigatory stop supported by reasonable suspicion.[4]  Second, the State agrees with the circuit court and

---

[2] Wiskowski also references Article I, Section 11 of the Wisconsin Constitution, but he makes no independent argument on this basis.  We decline to address this further.  As we have said, "any argument based on the Wisconsin Constitution must actually be grounded in the Wisconsin Constitution."  State v. Halverson, 2021 WI 7, ¶24, 395 Wis. 2d 385, 953 N.W.2d 847.

[3] When a search or seizure is unlawful, a common remedy is to suppress any evidence found as a result.  State v. Burch, 2021 WI 68, ¶16, 398 Wis. 2d 1, 961 N.W.2d 314.  The parties agree that suppression would be the proper remedy here.

[4] Neither party argued reasonable suspicion in the circuit court.  In the court of appeals, however, Wiskowski argued that Officer Simon's stop was not supported by reasonable suspicion. The State did not press the issue, and the court of appeals did not substantively address it.  State v. Wiskowski, No. 2021AP2105-CR, unpublished order, at 4 n.5 (Wis. Ct. App. Mar.

6

court of appeals that this was a permissible community caretaker activity. Neither succeed.

## A. Investigatory Stop

¶12 One type of intrusion deemed reasonable under the Fourth Amendment is an investigatory stop. Id., ¶7. This temporary infringement on personal liberty must be supported by reasonable suspicion——that is, in view of the whole picture, whether a reasonable police officer would reasonably suspect that criminal activity is afoot. Id., ¶10. While reasonable suspicion doesn't demand much, it does demand more than a hunch. Id., ¶8. And that is all we see here.

¶13 It is true that falling asleep in a drive-thru during the day could be a sign someone is impaired. It is also black-letter law that officers need not rule out the possibility of innocent behavior to initiate a traffic stop. Id. But by itself, without any additional indicators of impairment, we conclude this is too speculative to amount to reasonable suspicion.

¶14 By the time Officer Simon arrived, Wiskowski was driving normally out of the drive-thru and onto the road.

---

15, 2023). In briefing submitted to us, Wiskowski again defensively raises reasonable suspicion, which the State now contends is an independent basis to deny the motion to suppress. Although forfeiture generally applies to arguments not raised in the circuit court, we will address the State's reasonable suspicion argument given the unusual path by which this argument comes to us.

7

Officer Simon did not observe nor were there any reports of erratic driving. Wiskowski did not commit any traffic violations, and there were no other clues suggesting he was operating his vehicle while intoxicated. Other than falling asleep, no one reported any other kind of problematic behavior or indications of impairment during his visit to McDonald's. Midday drowsiness standing alone, without any other indicators of impairment, is simply not enough. Reasonable suspicion may be a low bar, but it's not that low. The State's contention that Officer Simon's traffic stop was supported by reasonable suspicion fails.[5]

### B. Community Caretaking

¶15 The State also argues that Officer Simon's seizure of Wiskowski during the traffic stop was justified as a permissible community caretaker activity. The line of community caretaker cases is rooted in the recognition that law enforcement work is multifaceted. State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598. Officers wear multiple hats. Id. Sometimes they are acting to enforce the law by investigating and stopping illegal activity. Id. Other times they act to protect property or help "a member of the public who is in need

---

[5] The State relies in part on State v. Rutzinski, 2001 WI 22, 241 Wis. 2d 729, 623 N.W.2d 516 and Navarette v. California, 572 U.S. 393 (2014). Both deal with the reliability of informant tips and are not relevant to this case.

of assistance." Id. This is what we have called the community caretaking function.

¶16 These diverse strains of law enforcement action sometimes blend together. An officer might aid someone in need and at the same time have a hunch something illegal occurred or observe evidence that gives rise to a criminal investigation. Id., ¶30. Yet when analyzing the permissibility of a seizure in the community caretaking context, we have emphasized that officers act as community caretakers when, viewed objectively, they engage in activities "totally divorced from the detection, investigation, or acquisition of evidence" of a crime. Id., ¶23 (quoting another source).

¶17 Although a recent decision of the United States Supreme Court raises questions regarding the proper way to analyze community caretaking claims, no party argues that we should alter or modify our precedent based on the facts of this case.[6] We therefore apply our precedent, which provides a three-step framework to guide our analysis. Id., ¶21.

---

[6] Our cases, like those of other jurisdictions, have described the community caretaking doctrine as arising out of a 1973 United States Supreme Court decision, Cady v. Dombrowski. See, e.g., State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598. However, the Supreme Court recently held that, although it has recognized law enforcement community caretaking duties, it has not created "a standalone doctrine that justifies warrantless searches and seizures in the home." Caniglia v. Strom, 593 U.S. 194, 196 (2021). Several justices concurred and raised questions about community caretaking as a separate doctrinal category, and how to properly analyze law enforcement's role in assisting citizens in need. See, e.g., id. at 199-200 (Roberts, C.J., concurring); id. at 200-04 (Alito, J., concurring); id. at 204-08 (Kavanaugh, J.,

¶18 The first step in cases like this is to determine whether a seizure within the meaning of the Fourth Amendment occurred. Id., ¶22. In this case, no one disputes that Officer Simon seized Wiskowski when he pulled him over.

¶19 Step two asks as an initial matter whether the officer was engaging in a bona fide community caretaking function. Id., ¶23. This means we examine whether this was an objective effort to assist a member of the public in need that was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. (quoting another source). Even if the answer is yes, however, that is not enough on its own to determine whether the seizure was lawful. The third step goes further. Tracking the Fourth Amendment's command, courts must balance the various interests to determine whether the exercise of that community caretaking activity was reasonable. Id., ¶40. We ultimately determine that, assuming without deciding Officer Simon had a bona fide community caretaking justification when he stopped Wiskowski, the continuation of the stop was unreasonable under the facts of this case. So we focus our analysis there.

¶20 Under this third step in a community caretaker analysis, we balance the "public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the

concurring). Given the briefing in this case and the narrow question presented, we too leave these questions for another day.

citizen." Id. This involves evaluating how important the intervention was and comparing it with how intrusive and proportional the seizure was given the alternatives.[7] Id., ¶¶41-45. The central question is——was the police intrusion aimed at assisting a member of the public in need reasonable under the circumstances?

¶21 In this case, key to our analysis is whether and when it is reasonable to extend a seizure undertaken for community caretaking purposes once an officer resolves the reason for the stop. The general rule across jurisdictions——and we agree——is that a seizure should not be extended beyond its initial justification absent some other justification that emerges, like reasonable suspicion.

¶22 In an instructive federal case, the Tenth Circuit considered whether officers who responded to a home in their community caretaking capacity acted unconstitutionally when they

---

[7] We have often analyzed the balance of interests in the third step by examining four factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Kramer, 315 Wis. 2d 414, ¶41. These factors are a less useful guide here because, as we explain below, the balancing in this case is conclusively settled by the principle that a community caretaking stop must end when the justification for the stop dissipates.

detained a man they mistakenly believed was someone else. Martinez v. Mares, 613 F. Appx 731, 733 (10th Cir. 2015).  After officers were informed that the man they detained was not who they thought, they nonetheless continued to detain him and proceeded to pat him down.  Id.  The man sued, arguing the detention was unlawful.  Id. at 734.  The officers responded that the stop fell within their community caretaker function. Id. at 738.  The court held that, without "some independent basis to detain and search him," officers were required to release the man once they discovered he was not the suspect. Id. at 739.  Why?  Because a "detention justified under an officer's community caretaking authority 'must last no longer than is necessary to effectuate its purpose, and its scope must be carefully tailored to its underlying justification.'"  Id. at 738 (quoting another source).

¶23 In another case, an officer responded to a call concerning an irregularly parked vehicle with the driver "slumped over the steering wheel."  State v. Zeimer, 510 P.3d 100, ¶2 (Mont. 2022).  When the officer went to check on the driver, he saw him "perk-up, check his mirrors, put the truck in gear, and lawfully drive away without any apparent indicia of peril, distress, or need for assistance."  Id., ¶33. At that point, the officer's welfare-check justification "evaporated."  Id.  But the officer detained and questioned the driver anyway.  Id., ¶¶3-6.  The Montana Supreme Court explained that welfare checks cannot be used as a pretext for an illegal search or seizure.  Id., ¶33.  "Once the objective facts and

12

circumstances manifest that the subject is not or no longer in peril, distress, or otherwise in need of assistance, the original constitutional justification for a CCD stop ends unless some other constitutional justification exists or arises for completing or prolonging the stop." Id. (cleaned up).

¶24 These cases reflect the general Fourth Amendment principle that "any warrantless intrusion must be as limited as is reasonably possible consistent with the purpose justifying it in the first instance."[8] Bies v. State, 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977). Accordingly, the scope of caretaking stops should be guided and limited by the original community caretaking justification. The justification for restricting a person's liberty ends when the welfare-check justification is resolved, provided no other independent reason exists to detain the person.[9]

---

[8] See also State v. Brooks, 2020 WI 60, ¶10, 392 Wis. 2d 402, 944 N.W.2d 832 (A traffic stop can "last no longer than necessary to complete the purpose of the [] stop."); Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'——to address the traffic violation that warranted the stop, and attend to related safety concerns.") (cleaned up).

[9] See State v. Ellis, 469 P.3d 65, 77 (Kan. 2020) (holding that "a public safety or welfare stop is not for investigative purposes and must end as soon as the officer determines the citizen is not in need of help"); United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014) (noting that the "scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop"); State v. Acrey, 64 P.3d 594, 600 (Wash. 2003) (en banc) (welfare check "must end when reasons for initiating an

13

¶25 Applying these principles to this case, we conclude that even if the original stop was a bona fide community caretaking activity, Officer Simon unreasonably extended the stop beyond its original justification. Officer Simon initially stopped Wiskowski to perform a welfare check and ensure he was safe to drive. But after their first conversation, nothing reinforced continued concern on that basis. In Officer Simon's telling, Wiskowski was "acting normal." Officer Simon asked Wiskowski about falling asleep in the drive-thru and received a reasonable explanation. Wiskowski did not show signs of sleepiness during their interaction. And Officer Simon did not see signs of a medical emergency. At that point, the public interest or exigency that may have existed was resolved; Officer Simon had no community caretaking justification to prolong the stop.[10]

¶26 Yet Officer Simon did prolong the stop. He held Wiskowski there as he endeavored to determine whether he had enough to justify a criminal investigation. Wiskowski was clearly not free to leave, despite the welfare-based justification for the initial stop failing to reveal further

---

encounter are fully dispelled") (quoting another source).

[10] The only behavior Officer Simon cites as "odd" was Wiskowski initially handing him the wrong insurance card, only to produce the correct one seconds later. Even entertaining the belief that this is odd, it did not portend that Wiskowski was suffering from any malady or otherwise in need of further assistance. Thus, it did not provide a justification for extending the stop.

14

concern. Under the facts of this case, Wiskowski was in no additional need of assistance. This means Officer Simon had no community caretaking justification to extend the stop, and should have allowed Wiskowski to leave.

¶27 It is true that when the community caretaking concern dissipated, Officer Simon could have continued Wiskowski's detainment if facts emerged during their initial conversation that gave rise to reasonable suspicion. Indeed, Officer Simon's focus turned to criminal investigation as he probed for a reason to pull Wiskowski out of his car. But Officer Simon did not smell alcohol on Wiskowski and did not observe any other evidence of possible impairment. Having nothing more than a thought that "something was kind of going on that maybe [he] wasn't seeing in the car"——i.e., a "hunch"——Officer Simon detained Wiskowski well beyond the stop's justification. If Officer Simon, armed solely with a report that a driver fell asleep in a drive-thru, did not have reasonable suspicion when he stopped Wiskowski, reasonable suspicion certainly did not materialize following an initial encounter revealing no new evidence of impaired driving.

¶28 In short, Officer Simon's original community caretaking justification of helping a member of the public who is in need of assistance dissipated after their initial encounter. At this point, the restriction on Wiskowski's liberty should have ended. The stop transformed from a welfare check into the "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,"

15

without the attendant reasonable suspicion necessary to justify further detention. Id., ¶11 (quoting another source). Officer Simon ceased being a community caretaker and, thus, had no authority to extend the stop on that basis.

### III. CONCLUSION

¶29 We conclude that Officer Simon's seizure of Wiskowski violated Wiskowski's rights under the Fourth Amendment. Officer Simon did not possess reasonable suspicion to conduct the stop. And even assuming Officer Simon initially engaged in bona fide community caretaker activity when he stopped Wiskowski, he unlawfully prolonged the stop and began an investigation without reasonable suspicion. We therefore reverse the court of appeals decision and remand to the circuit court with instructions to vacate the judgment of conviction and grant the motion to suppress.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.

¶30 BRIAN HAGEDORN, J. *(concurring).* The opinion for the court applies our precedent on the community caretaking role of law enforcement, which the parties did not call into question in this case. I write separately for two reasons. First, I explain why the State is wrong to suggest that Wis. Stat. § (Rule) 809.62(3m)(b)1. permits it to raise a reasonable suspicion argument before us despite not raising it in the circuit court. Second, I discuss why our precedents on community caretaking may need refinement to better accord this legitimate function of law enforcement with the Fourth Amendment principles outlined by the United States Supreme Court.

## I. WIS. STAT. § (RULE) 809.62(3m)(b)1.

¶31 In our system of appellate review, the default rule is that parties may not raise new arguments on appeal that have not been briefed or preserved in the circuit court. Estate of Miller v. Storey, 2017 WI 99, ¶67, 378 Wis. 2d 358, 903 N.W.2d 759. If parties do not timely assert their rights, they forfeit their opportunity to raise them later.[1] Id.

¶32 The rule of forfeiture is "as old as the common law system of appellate review," and for good reason. State v. Counihan, 2020 WI 12, ¶60, 390 Wis. 2d 172, 938 N.W.2d 530 (Rebecca Grassl Bradley, J., concurring) (quoting another source). By requiring issues and objections to be timely

---

[1] Appellate courts can, however, exercise their discretion to hear forfeited issues. Estate of Miller v. Storey, 2017 WI 19, ¶67, 378 Wis. 2d 358, 903 N.W.2d 759.

1

raised, errors can be corrected by the circuit court, thereby eliminating the need for or circumscribing the scope of appellate review. State v. Ndina, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612. This also prevents sandbagging, where litigants might strategically fail to object or raise issues so they can make later claims for reversal. State v. Huebner, 2000 WI 59, ¶12, 235 Wis. 2d 486, 611 N.W.2d 727. Forfeiture thus incentivizes diligent preparation on the front end, and saves appellate courts from being "in the awkward position of 'telling a lower court it was wrong when it was never presented with the opportunity to be right.'" State ex rel. Davis v. Cir. Ct. for Dane Cnty., 2024 WI 14, ¶78, 411 Wis. 2d 123, 4 N.W. 2d 273 (Hagedorn, J., concurring) (quoting another source). The appellate system exists to review errors in the court below, not to give litigants a do-over on claims that could have been tried or addressed the first time around. In short, forfeiture is critical to the accuracy, efficiency, and fairness of the case-deciding function of the judiciary.

¶33 In this case, the State argued in the circuit court that Officer Simon lawfully stopped Wiskowski based on the community caretaking doctrine. It made no mention of reasonable suspicion. The circuit court agreed with the State's community caretaking argument, so Wiskowski appealed. But in the court of appeals, Wiskowski defensively argued that Officer Simon possessed neither reasonable suspicion nor a valid community caretaking justification for the stop. The State explained that it would not respond to Wiskowski's reasonable suspicion

2

argument because the circuit court relied only on the community caretaking doctrine. The court of appeals did not address reasonable suspicion.

¶34 Wiskowski then petitioned us for review. Rather than raise the only legal claim relied on by the State at the circuit court (community caretaking), Wiskowski again asserted that Officer Simon lacked reasonable suspicion. After we granted the petition for review, Wiskowski briefed both questions. Then, unlike its position in the court of appeals, the State argued for the first time that Officer Simon had reasonable suspicion for the stop, in addition to a valid community caretaking justification. It acknowledged that normally forfeiture would prohibit it from raising this new issue on appeal. But the State argued that Wis. Stat. § (Rule) 809.62(3m)(b)1. permits parties to defend the court of appeals' outcome on any ground——even grounds not presented to the circuit court——as long as it wouldn't change the ultimate result. Thus, because reasonable suspicion could support the same outcome in this case, the State contends the rule permits it to be raised. Although Wiskowski's unusual tactic of raising reasonable suspicion rather than relying on forfeiture causes us to address the argument in this case, the State's reliance on § (Rule) 809.62(3m)(b)1. is misplaced.[2]

¶35 Section 809.62 governs petitions for review——formal requests for this court to review a decision of the court of

---

[2] I respond only to the State's argument on Wis. Stat. § (Rule) 809.62(3m)(b)1., and express no opinion on how other provisions or rules might apply here.

3

appeals. These are brought by parties who did not achieve their preferred outcome——i.e., what the rule calls an "adverse decision." § (Rule) 809.62(1g). Following a petition for review, non-petitioning parties have an opportunity to respond, telling us why we should not take the case.

¶36 The rule also permits petitions for cross-review during the time frame when initial petitions are filed, or within 30 days after a petition for review is filed by another party. § (Rule) 809.62(3m)(a). The rule relied upon by the State here says:

> A petition for cross-review is not necessary to enable an opposing party to defend the court of appeals' ultimate result or outcome based on any ground, whether or not that ground was ruled upon by the lower courts, as long as the supreme court's acceptance of that ground would not change the result or outcome below.

§ (Rule) 809.62(3m)(b)1. In other words, parties don't have to file cross-petitions to defend the result or outcome obtained in the court of appeals on different grounds. The obvious application of the rule is that a party who argues in the circuit court that it should win for reasons A and B can still argue both A and B without filing a petition for cross review—— even if the circuit court ruled in their favor for reason A alone, and did not address reason B at all.

¶37 The State, however, reads this to mean that even a legal argument not raised below can be argued on appeal if it supports the same legal outcome. Not so. That would require interpreting this common-sense procedural rule as overriding or abandoning the principle of forfeiture——a rule as old as the

4

common law system itself. Nothing in the text of the rule suggests so radical a proposition. And nothing in this court's practice suggests we have abandoned basic forfeiture standards, as the State's position implies. Indeed, we discuss, debate, and apply forfeiture all the time.

¶38 In short, § (Rule) 809.62(3m)(b)1. should not be understood as altering the regular rules regarding forfeiture; it is not an invitation for litigants to raise new, unpreserved arguments. Rather, it permits parties to argue previously raised or preserved arguments that were not addressed by the circuit court without needing to file a petition for cross-review.

## II. COMMUNITY CARETAKING

¶39 Turning to the substantive issue, both the United States and Wisconsin constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Wis Const. art. I, § 11. As evidenced by the text, the ultimate touchstone of the Fourth Amendment is reasonableness. Lange v. California, 141 S. Ct. 2011, 2017 (2021). Wisconsin courts have held that searches and seizures may be reasonable when officers act "as a community caretaker to protect persons and property." State v. Pinkard, 2010 WI 81, ¶14, 327 Wis. 2d 346, 785 N.W.2d 592. As the majority opinion explains, this line of cases reflects the reality that police work is not one-dimensional. While officers investigate and respond to criminal activity, they also secure property and help members of the public in need of assistance.

This is what we have called the "community caretaker function." State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598.

¶40 Our cases addressing this doctrine do not derive from an independent analysis of the Wisconsin Constitution's text or history. Rather, we rely on United States Supreme Court precedent. Pinkard, 327 Wis. 2d 346, ¶14 ("[W]e look to the United States Supreme Court's interpretation of the community caretaker exception to the Fourth Amendment's warrant requirement."). To that end, our cases point back to a United States Supreme Court case, Cady v. Dombrowski,[3] as the origin of this doctrine. Id., ¶15. Just a few terms ago, however, the Supreme Court held that the Fourth Amendment does not grant officers a broad community caretaking license to search homes. Caniglia v. Strom, 593 U.S. 194, 199 (2021). The Court further cast at least some doubt about whether the community caretaker doctrine is a standalone category through which police conduct should be analyzed. Id.

¶41 If that's true, the doctrines our cases use to address this kind of law enforcement action may be due for a reassessment. My aim in this writing is to start the conversation by briefly telling the story of how the community caretaker doctrine came to be, surveying where it stands now, and raising questions that this and other courts may need to address in future cases.

---

[3] 413 U.S. 433 (1973).

6

A. <u>Cady</u> and Community Caretaking

¶42 This court (along with many others) has said that the community caretaking doctrine "has its origins" in <u>Cady</u>. <u>Kramer</u>, 315 Wis. 2d 414, ¶19; <u>Pinkard</u>, 327 Wis. 2d 346, ¶15. <u>Cady</u> itself comes from a line of cases involving what the United States Supreme Court would describe as "caretaking" searches of vehicles in police custody.

¶43 Six years prior to <u>Cady</u>, the Supreme Court was asked whether officers could lawfully search a vehicle within their custody. <u>Cooper v. California</u>, 386 U.S. 58, 60 (1967). Police impounded the vehicle after arresting the defendant for transporting narcotics. <u>Id.</u> California law required the police to seize vehicles used to transport narcotics and to hold them as evidence until the conclusion of forfeiture proceedings. <u>Id.</u> After seizing the defendant's vehicle, the officers conducted a search and found a small piece of a brown paper sack that was later used as evidence in the defendant's trial. <u>Id.</u> at 58. The Supreme Court ultimately upheld the search. Because California law required the police to impound the car and hold it until forfeiture proceedings finished, the search was "closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained." <u>Id.</u> Further, the court explained, "it would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." <u>Id.</u> at 61-62. Thus, the search did not offend the Fourth Amendment. <u>Id.</u>

7

¶44 The Court dealt with another vehicle search the next term. In Harris v. United States, police had impounded the defendant's vehicle and searched it to remove all valuables pursuant to department regulations. 390 U.S. 234, 235 (1968) (per curiam). Following the search, an officer rolled up the windows and locked the doors to protect the car, when he then discovered evidence of a robbery that was later used at the defendant's trial. Id. at 234-35. The defendant challenged the search, unsuccessfully. Id. at 234. The Court concluded that the discovery of incriminating evidence was not the result of a search requiring a warrant, "but of a measure taken to protect the car while it was in police custody." Id. at 236.

¶45 These cases served as the foundation for Cady——the supposed originator of the community caretaking doctrine. Like its predecessors, Cady concerned the scope of officers' authority to search a vehicle within their custody. 413 U.S. 433, 446-47 (1973). The search in Cady took place after the defendant——a Chicago police officer——drunkenly crashed his car in West Bend, Wisconsin. Id. at 436. The West Bend officers who responded to the scene believed that Chicago police officers were required to carry their service revolvers at all times, but they did not find one on the defendant. Id. Their department had a "standard procedure" to search for weapons that might "fall into untrained or perhaps malicious hands," so they searched the car's front seat and glove compartment. Id. at 436, 443. They found no revolver, however, and eventually had the car towed to a private garage. Id. at 436. One of the

8

officers then went to the garage to keep searching for weapons. Id. While doing so, he discovered evidence of a murder that was later used to convict the defendant. Id. at 438-39.

¶46 The search was challenged under the Fourth Amendment. Id. at 434. The Supreme Court began its analysis by observing the wide variety of reasons state and local law enforcement may come into contact with automobiles——reasons that go well beyond criminal investigation. Id. at 441. Examples might include responding to accidents, assisting disabled vehicles, and enforcing vehicle regulations. Id. The Court described these noncriminal police-citizen contacts as the "community caretaking functions" of police:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Id. (emphasis added). The Court noted that these considerations guided its decision in Cooper——where officers searched the vehicle to "guarantee the safety of the custodian"——and in Harris——where officers searched the vehicle "to safeguard the owner's property." Id. at 447. This case involved a search with similar motivations——"concern for the safety of the general public" should someone find the revolver. Id. And although the police did not have physical custody of the car, they exercised control of it by directing it to be towed to a private garage.

9

Id. at 446. Thus, the officers' "caretaking 'search'" did not violate the Fourth Amendment. Id.

¶47 The Court revisited vehicle searches three years later. South Dakota v. Opperman, 428 U.S. 364, 365 (1976). By that time, police departments throughout the country had established standard procedures to search and inventory the contents of impounded vehicles. Id. at 369, 376. In Opperman, officers inventoried the defendant's car, found marijuana, and charged him accordingly. Id. at 366. He argued the search was unconstitutional, but the Supreme Court disagreed. Id. at 376.

¶48 Citing Cady, the Court recognized that police officers will come into frequent, noncriminal contact with automobiles as part of their "community caretaking functions." Id. at 367-69. The Court mentioned examples such as responding to accidents or disabled vehicles, removing vehicles that violate parking ordinances, and examining vehicles for other regulatory violations. Id. Officers' authority to do so was "beyond challenge." Id. at 369. Inventory——or "caretaking"——procedures fell into the same category of noncriminal activities. Id. Police departments developed these policies to safeguard the owner's property, prevent claims against the police for lost or stolen items, and protect officers from potential danger. Id. Citing Cooper, Harris, and Cady, the Court noted that it had consistently upheld vehicle intrusions "aimed at securing or protecting the car and its contents." Id. at 373. Those cases "unmistakably" pointed to the conclusion that "inventories pursuant to standard police procedures are reasonable." Id. at

10

372. Thus, the inventory search in Opperman did not violate the Fourth Amendment. Id. at 376.

¶49 To summarize, this line of cases stands for the proposition that some noncriminal "caretaking" searches of vehicles in police custody are reasonable. See Colorado v. Bertine, 479 U.S. 367, 372 (1987) (noting that Cooper, Harris, Cady, and Opperman "accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody"). None of these cases explicitly created a freestanding doctrine by which courts should evaluate all "community caretaking" actions by the police.[4]

## B. How Cady Became a Doctrine

¶50 That raises the question of how Cady's recognition of the noncriminal community caretaking actions of police came to take on a life of its own. This story is related to and occurred alongside of other cases involving exigent circumstances and the emergency aid doctrine.

¶51 We begin with exigent circumstances. The Supreme Court had for years required police to obtain a warrant before entering a person's home. See Katz v. United States, 389

---

[4] See United States v. Pichany, 687 F.2d 204, 208-09 (7th Cir. 1982) (explaining that the Supreme Court did not "intend to create a broad exception to the Fourth Amendment warrant requirement" for various caretaking activities; rather, the Cady Court "articulated several premises behind its decision which indicate that the holding in the case extended only to automobiles temporarily in police custody").

11

U.S. 347, 357 (1967) (collecting cases). But the court began outlining various circumstances of an urgent character where there wasn't time to obtain a warrant, yet a search was permissible. Id. This applied to a wide variety of exigencies, some criminal and some noncriminal——for example, fighting a fire and investigating its cause;[5] preventing imminent destruction of evidence;[6] engaging in hot pursuit of a fleeing suspect;[7] and rendering emergency aid to persons seriously injured or threatened with serious injury.[8]

¶52 The last of these exigencies eventually became known as the emergency aid exception. See Kentucky v. King, 563 U.S. 452, 460 (2011); Michigan v. Fisher, 558 U.S. 45, 47 (2009) (per curiam). The Court identified this category of reasonable searches only a few years after Cady. See Mincey v. Arizona, 437 U.S. 385, 390 (1978). In Mincey, it recognized that the Fourth Amendment "does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Id. The "need to protect or preserve life or avoid serious injury" justified what would otherwise be impermissible absent an emergency. Id.

---

[5] Michigan v. Tyler, 436 U.S. 499, 509 (1978).

[6] Ker v. California, 374 U.S. 23, 40 (1963) (plurality opinion).

[7] Warden v. Hayden, 387 U.S. 294, 298 (1967); United States v. Santana, 427 U.S. 38, 42 (1976).

[8] Mincey v. Arizona, 437 U.S. 385, 403 (1978); Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

12

¶53 But the emergency aid exception was understood to be limited in nature, applying only to the provision of emergency aid. It was not extended to assisting a disabled vehicle, for example, or conducting a non-emergency welfare check in someone's home. This led litigants and courts to Cady, which had recognized that officers routinely engage in many noncriminal, community caretaking functions such as assisting disabled vehicles or responding to accidents. 413 U.S. at 441. Courts thus began citing Cady to justify these non-emergency situations. And soon enough, in most courts around the country, Cady's identification of the community caretaking functions of police evolved into a doctrine that justified searches and seizures of all kinds.

¶54 The Texas Court of Appeals issued a decision fifteen years after Cady following this logic. In McDonald v. State, an officer observed the defendant pull off the road and slump over his steering wheel. 759 S.W.2d 784, 784 (Tex. Ct. App. 1988). After the defendant awoke and attempted to drive off, the officer stopped him to make sure he was okay. Id. He then observed signs of intoxication. Id. On appeal, the Texas Court of Appeals upheld this seizure. Id. at 785. Although the court observed that it was "unclear when a police officer may make a stop for reasons other than criminal ones," it quoted Cady for the proposition that police officers "have a duty to protect the general welfare and safety of the public at large and individuals on the highways." Id. This was such a situation. The defendant's behavior could have rendered him "unfit to

13

drive" which would endanger both himself and others. Id. The court found the situation analogous to that "of the right of a fireman to enter a burning building to fight the fire without a warrant." Id. It therefore held that the officer's welfare check did not violate the Fourth Amendment. Id.

¶55 Similar cases proliferated around the country. See Ullom v. Miller, 705 S.E.2d 111, 120 (W. Va. 2010) (collecting cases). These cases dealt largely with searches and seizures of vehicles——which was, after all, what Cady was about.[9] But in time, the "community caretaking exception" was also extended to searches of the home. See State v. Deneui, 775 N.W.2d 221, ¶36 n.8 (S.D. 2009) (collecting cases).

¶56 This same evolution took place in Wisconsin. We too developed what we called the "emergency doctrine." This permitted warrantless home entries if the officer subjectively perceived a need to render emergency aid and the situation objectively presented such an emergency. State v. Boggess, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983).

¶57 The community caretaker doctrine emerged around the same time, though by a different path. In 1977, four years after Cady, we addressed whether it was lawful for a police officer to peer into the defendant's garage after a neighbor

---

[9] See State v. Mitchell, 498 N.W.2d 691, 694 (Iowa 1993) (burned-out taillight); State v. Vistuba, 840 P.2d 511, 514 (Kan. 1992) (driving on shoulder); State v. Pinkham, 565 A.2d 318, 318 (Me. 1989) (improper lane change); State v. Oxley, 503 A.2d 756, 759 (N.H. 1985) (unsecured furniture on back of car); State v. Harrison, 533 P.2d 1143, 1144 (Ariz. 1975) (bouncing left tire).

14

filed a noise complaint. Bies v. State, 76 Wis. 2d 457, 462, 257 N.W.2d 461 (1977). We said yes. We explained that checking on noise complaints was "probably more a part of the community caretaker function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role." Id. at 467.

¶58 The court of appeals took it a step further a decade later. In State v. Anderson, two officers were patrolling an alley in the early hours of the morning when they saw the defendant turn into the alley and drive in their direction. 142 Wis. 2d 162, 164, 417 N.W.2d 411 (Ct. App. 1987). But upon noticing their presence, the defendant exited the alley. Id. They recognized the defendant because several businesses had complained that he had been parking in their reserved spots. Id. Based on his abrupt exit of the alley and the parking complaints, the officers pulled him over. Id. at 165. After speaking with him, they discovered several weapons that led to felon in possession and other related charges. Id. at 164-65. Among other things, he challenged the officers' authority to pull him over. Id. at 166. The circuit court upheld the seizure based on reasonable suspicion but, on appeal, the arguments focused on whether the officers lawfully seized the defendant as part of their "community caretaker function." Id.

¶59 The court of appeals began by explaining the concept, citing Cady and Bies. Id. at 166-67. Although "lacking in some respects the urgency of criminal investigation," the court

15

described community caretaking as an "important and essential part of the police role." Id. at 167. That did not, however, remove such actions from constitutional scrutiny. Id. The court fashioned a three-part test for analyzing such claims: "(1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual." Id. at 169. The court, however, did not decide the question. Although it noted that "police contacts with citizens seeking to resolve or defuse private disputes (such as trespassing) are certainly within the community caretaker function," there was a suggestion that the officers' stop was pretextual. Id. at 170. The court therefore remanded the case to the circuit court to employ the test.[10] Id.

¶60 In 2000, the court of appeals extended the doctrine to the home. State v. Horngren, 2000 WI App 177, ¶¶10-18, 238 Wis. 2d 347, 617 N.W.2d 508. Officers there entered the defendant's home after the police received a report that he was attempting to commit suicide. Id., ¶¶2-3. Although the court explained that the officers were rendering "immediate aid and

---

[10] Subsequent court of appeals decisions used Anderson's test, although not resulting in a decision in the State's favor. See State v. Dull, 211 Wis. 2d 652, 659, 565 N.W.2d 575 (Ct. App. 1997) (officer's warrantless entry into home not justified under community caretaking because he arrested a juvenile and had thus stepped out of his caretaking role); State v. Paterson, 220 Wis. 2d 526, 535-36, 583 N.W.2d 190 (Ct. App. 1998) (even if officer's warrantless home entry in response to a reported burglary was bona fide community caretaking activity, the balancing test tipped in defendant's favor).

16

assistance," it upheld the warrantless entry using the community caretaking framework outlined in Anderson, not the emergency aid doctrine.[11] Id., ¶11.

¶61 The court of appeals applied the doctrine to a variety of similar scenarios in the following years. See State v. Ferguson, 2001 WI App 102, ¶1, 244 Wis. 2d 17, 629 N.W.2d 788 (upholding warrantless bedroom search because officers discovered underage drinking in the apartment and feared occupants of a locked room may be injured); State v. Ziedonis, 2005 WI App 249, ¶¶17-34, 287 Wis. 2d 831, 707 N.W.2d 565 (upholding warrantless home entry after police received 911 call about the defendant's two vicious dogs on the loose and officers found his back door ajar); State v. Truax, 2009 WI App 60, ¶¶11-21, 318 Wis. 2d 113, 767 N.W.2d 369 (upholding seizure because officer saw defendant abruptly exit the roadway and wanted to make sure the driver was not suffering from a medical problem or the car from mechanical failure).

¶62 A lead opinion in this court first applied Anderson's test in 2001.[12] State v. Kelsey C.R., 2001 WI 54, ¶¶36-37, 243 Wis. 2d 422, 626 N.W.2d 777 (lead op.). The officers in that case had seized the defendant, a young girl who was sitting

---

[11] Horngren was not the only case to blend community caretaking and emergency aid. See State v. Pinkard, 2010 WI 81, ¶26 n.8, 327 Wis. 2d 346, 785 N.W.2d 592 (collecting cases mixing the two); State v. Deneui, 775 N.W.2d 221, ¶22 (S.D. 2009) (observing the confusion).

[12] Although the majority opinion was not joined by four justices, all seven appeared to agree with its application of Anderson's community caretaking test.

alone in a high-crime area at night, to make sure she was not a runaway. Id., ¶5. The opinion upheld the seizure as a reasonable exercise of the officers' community caretaking function. Id., ¶¶36-37.

¶63 Eight years after Kelsey C.R., we officially adopted the Anderson test. Kramer, 315 Wis. 2d 414, ¶¶20-21. Kramer, like Anderson and Kelsey C.R., involved a seizure. Id., ¶2. An officer seized the defendant who had parked his car on the side of a county highway with its hazards flashing. Id., ¶¶4-5. We upheld the seizure as a lawful exercise of the officer's community caretaking function. Id., ¶3.

¶64 A year after Kramer, we held that the exception permits warrantless home entries. Pinkard, 327 Wis. 2d 346, ¶¶13-27. Officers in Pinkard had entered the defendant's home to check on the welfare of its residents after an anonymous caller expressed concern for the house's occupants. Id., ¶¶2-4. Once inside, officers discovered drugs which led to charges. Id., ¶¶5-6. The circuit court upheld the officers' actions based on the community caretaking exception. Id., ¶7. In this court, the defendant argued that Cady and Opperman limited the community caretaking exception to incidents involving automobiles. Id., ¶19. We disagreed. We concluded Cady and Opperman were not limited to automobiles; instead, they counseled a cautious approach when employing the exception in the home. Id., ¶20. We also harkened back to the very first community caretaker case in Wisconsin——Bies v. State. Id., ¶21. Bies upheld an officer's search of a homeowner's garage——an area

18

constitutionally protected as part of the home. 76 Wis. 2d at 467. Bies, therefore, implied that such community caretaker searches within the home are permissible, and other states had come to a similar conclusion. Pinkard, 327 Wis. 2d 346, ¶¶22-27. We therefore upheld the search. Id., ¶63.

¶65 Our use of community caretaking grew as time went on. In 2013, we upheld officers' warrantless entry into the defendant's bedroom to make sure he was not injured after a car accident. State v. Gracia, 2013 WI 15, ¶3, 345 Wis. 2d 488, 826 N.W.2d 87. In 2015, we held officers' seizure of the defendant reasonable because they sought to transport him to the hospital for carbon monoxide poisoning, reported chest pain, and suicidal comments. State v. Blatterman, 2015 WI 46, ¶¶1-2, 362 Wis. 2d 138, 864 N.W.2d 26. In 2016, we permitted a warrantless room entry after officers followed a blood trail to the defendant's house and entered a room to make sure no one was hurt. State v. Matalonis, 2016 WI 7, ¶3, 366 Wis. 2d 443, 875 N.W.2d 567. Finally, in 2017, we upheld officers' seizure of the defendant's car because it was blocking access to a private storage unit, officers wanted to protect the property inside the car from theft, and the car was registered to someone else. State v. Asboth, 2017 WI 76, ¶¶1, 18-21, 376 Wis. 2d 644, 898 N.W.2d 541.

¶66 Our cases——and those in other states——paint a clear picture. After four decades, the community caretaker functions of police recognized in Cady expanded from its original application to automobile inventory searches into a broad

doctrine. Courts utilized this framework to permit all kinds of noncriminal searches and seizures, both on the road and in the home. These doctrinal developments marched forward in the lower courts with little to no direction from the United States Supreme Court. That changed in 2021.

### C. *Caniglia* and the Future of the Doctrine

¶67 Almost 50 years after *Cady*, the United States Supreme Court heard a case questioning whether the community caretaker doctrine supported a warrantless home entry. *Caniglia*, 593 U.S. at 194. In *Caniglia*, the plaintiff and his wife got into an argument in their home. *Id.* at 196. The husband eventually pulled out his handgun and told his wife to "shoot him now and get it over with." *Id.* (cleaned up). She left, but called the police the next day after she couldn't reach him. *Id.* When officers arrived, they found the plaintiff on his porch. *Id.* He agreed to go to the hospital, and the officers then searched his home for the gun. *Id.* at 197. They found and confiscated two firearms. *Id.* The plaintiff sued the city and the police officers, arguing his Fourth Amendment rights were violated. *Id.* The District Court granted summary judgment to the defendants, and the First Circuit affirmed based on the "community caretaking exception." *Id.*

¶68 The Supreme Court saw it differently. In a brief, unanimous opinion, the Court reiterated that officers are sometimes permitted to enter the home and its curtilage without a warrant, such as when rendering emergency aid. *Id.* at 198.

20

The First Circuit's community caretaking rule, however, went beyond anything the Court had recognized. Id. Cady involved the search of an impounded vehicle, not a home. Id. at 199. And the Cady court "expressly contrasted its treatment of a vehicle already under police control with a search of a car 'parked adjacent to the dwelling place of the owner.'" Id. (quoting another source). This distinction between vehicles and homes placed Cady's use of the phrase "community caretaking" into its proper context. Id. The Court had used the phrase to explain why frequent traffic accidents and disabled vehicles often require the police to perform noncriminal "community caretaking functions," such as aiding motorists. Id. This recognition that officers perform a variety of noncriminal tasks as part of their duties was exactly that——"a recognition that these tasks exist, and not an open-ended license to perform them anywhere." Id. Therefore, because the First Circuit had extended Cady beyond its holding and logic, the Supreme Court reversed. Id.

¶69 Chief Justice Roberts, Justice Alito, and Justice Kavanaugh concurred. Chief Justice Roberts, joined by Justice Breyer, clarified that the Court's decision should not be read as changing the Court's prior holdings that officers can enter homes without warrants when assisting persons who are seriously injured or threatened with such injury. Id. at 199-200 (Roberts, C.J., concurring). Police have a proper role in "preventing violence and restoring order, not simply rendering first aid to casualties." Id. at 199.

21

¶70 Justice Alito agreed with the Court "that there is no special Fourth Amendment rule for a broad category of cases involving 'community caretaking.'" Id. at 200 (Alito, J., concurring). He worried that community caretaking was too amorphous a concept that could involve a variety of tasks, with no clear limiting principle. Id. Given this, the same Fourth Amendment principles used in criminal cases "may not be appropriate for use in various non-criminal-law-enforcement contexts." Id. at 201. In addition, among other concerns, Justice Alito pointed to the lack of cases addressing a very real world scenario: a risk of suicide that is real, but whose immediacy is unclear. Id. at 202. This type of encounter falls outside of the typical "exigent circumstances" exception to the warrant requirement because it lacks an apparent exigency. Id. Thus, courts will likely need "to grapple with the basic Fourth Amendment question of reasonableness." Id. at 203.

¶71 Justice Kavanaugh wrote to underscore Chief Justice Roberts's point that the Court's decision did not "prevent officers from taking reasonable steps to assist those who are inside a home and in need of aid." Id. at 204 (Kavanaugh, J., concurring). Although Cady dealt with vehicles rather than homes, the issue was "more labeling than substance." Id. at 205. The Court's case law already included the "exigent circumstances doctrine" which permitted officers to enter homes without warrants to assist persons "who are seriously injured or threatened with such injury." Id. at 206 (quoting another source). The officers in Caniglia had not relied on that

22

doctrine, leading to the Court's ultimate conclusion. But that did not change longstanding exigent circumstances precedent. Id.

¶72 So where does that leave us now? First, Caniglia appears to mean that Wisconsin cases permitting home entries under community caretaking are no longer good law——at least insofar as they rely on community caretaking to justify the intrusion. It remains to be seen whether other doctrines might lead to the same outcome.

¶73 More generally, Caniglia also suggests that the Supreme Court is uncomfortable with community caretaking as a broad category authorizing warrantless searches and seizures. However, it seems equally clear that the Court is not abandoning the proposition that some searches and seizures by law enforcement conducted to aid citizens, protect property, and ensure safety are permissible under the Fourth Amendment.

¶74 Therefore, we may soon need to address whether to formally abandon community caretaking as a separate, freestanding doctrine through which warrantless searches and seizures should be evaluated. If we do so, courts may need to wrestle with whether functions we might now categorize as "community caretaking" may be better understood or evaluated under other doctrines, such as emergency aid or exigent circumstances, as Justice Kavanaugh suggested. See State v. Ware, 2021 WI App 83, ¶15, 400 Wis. 2d 118, 968 N.W.2d 752 ("Because the community caretaker exception cannot justify the warrantless search of a home under Caniglia, we frame our

23

analysis using the related——but conceptually distinct——emergency aid exception to the warrant requirement of the Fourth Amendment."). In addition, it's possible some of the more expansive understandings of community caretaking in Wisconsin and elsewhere may need to be circumscribed. This is especially true where the need for the search or seizure is less urgent or could be accomplished through other means.

¶75 Given this newfound uncertainty, both this court and the court of appeals must work to ensure our decisions have a firm foundation in United States Supreme Court precedent. While this case does not ask us to resolve these questions, I write here to highlight them so the discussion can begin.

¶76 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence with respect to ¶¶39-75, and Justice JANET PROTASIEWICZ joins with respect to ¶¶72, 74-75.

24

¶77 JANET C. PROTASIEWICZ, J. *(concurring).* I concur with the majority opinion. I write separately to address confusion in the law regarding a respondent's ability to argue alternative grounds for affirming the court of appeals in its response brief. The State seems confused because it erroneously cited Wis. Stat. § (Rule) 809.62(3m)(b)1. regarding petitions for cross-review to justify waiting until its response brief to argue reasonable suspicion. And this court has sown confusion by, in some cases, ignoring Wis. Stat. § (Rule) 809.62(3)(d) and improperly holding respondents to rules that govern only petitioners. The court should clarify the law on these matters.

I. RULES

¶78 Rule 809.62 governs how petitioners and respondents preserve issues for this court's review. The rule governing petitioners uses "shall" and is mandatory. The rule governing respondents uses "may" and is permissive.[1]

¶79 A petition for review "<u>must</u> contain a statement of the issues the petitioner seeks to have reviewed" and "<u>shall also identify any issues the petitioner seeks to have reviewed that were not decided by the court of appeals</u>." Wis. Stat. § (Rule) 809.62(2)(a) (emphasis added). If the court grants the petition for review, the petitioner "<u>cannot raise or argue issues not set</u>

---

[1] The word "shall" ordinarily is presumed to be mandatory. The word "may" indicates a possibility. When the two words appear in the same statute, courts presume that the words have their precise meanings. <u>Heritage Farms, Inc. v. Markel Ins. Co.</u>, 2012 WI 26, ¶32, 339 Wis. 2d 125, 810 N.W.2d 465.

forth in the petition . . . unless ordered otherwise by the supreme court." Wis. Stat. § (Rule) 809.62(6) (emphasis added).[2]

¶80 In contrast, the rules governing the responses are permissive. The respondent "may file a response to a petition." Wis. Stat. § (Rule) 809.62(3) (emphasis added). But a response is not required. If the respondent chooses to file a response, it "may contain . . . any alternative ground supporting the court of appeals result or a result less favorable to the opposing party than that granted by the court of appeals." Wis. Stat. § (Rule) 809.62(3)(d) (emphasis added). This rule "addresses the circumstances in which the respondent asserts an alternative ground to defend the court of appeals' ultimate result or outcome, whether or not that ground was raised or ruled upon by the lower courts." Judicial Council Committee Comment, July 2008, Wis. Stat. § (Rule) 809.62(3)(d) (emphasis added).[3]

¶81 Similarly, Rule 809.62(3m)(b)1. provides that a respondent need not file a petition for cross-review in order "to defend the court of appeals' ultimate result or outcome based on any ground, whether or not that ground was ruled upon by the lower courts, as long as the supreme court's acceptance of that ground would not change the result or outcome below."

---

[2] However, "[o]nce a case is before us, it is within our discretion to review any substantial and compelling issue which the case presents." Univest Corp. v. Gen. Split Corp., 148 Wis. 2d 29, 32, 435 N.W.2d 234 (1989).

[3] Judicial Council Committee Comments "may be consulted for guidance in interpreting and applying Wis. Stat. ss. 809.30, 809.32 and 809.62." Sup. Ct. Order No. 04-08, 2008 WI 108.

(Emphasis added).  "Any such alternative ground for affirmance or lesser relief should, however, be identified in the response."  Judicial Council Committee Comment, July 2008, Wis. Stat. § (Rule) 809.62(3m)(b) (citing Rules 809.62(3)(d), (3)(e), and (6)).  The rule uses the word "should" not "shall."

¶82 Our case law provides additional guidance for respondents on these matters.  Where an issue was presented to, but not decided by, the court of appeals, the respondent may assert it in its brief for this court and fully discuss it.  Cynthia E. v. LaCrosse Cnty. Hum. Servs. Dep't, 172 Wis. 2d 218, 232-33, 493 N.W.2d 56 (1992); Smith v. Anderson, 2017 WI 43, ¶¶24-26, 374 Wis. 2d 715, 893 N.W.2d 790 (Abrahamson, J. dissenting).  This court may exercise its discretion to review the issue.  Univest Corp. v. General Split Corp., 148 Wis. 2d 29, 39, 435 N.W.2d 234 (1989).  Nothing guarantees that this court will exercise its discretion to review it.  Cynthia E., 172 Wis. 2d at 232.

¶83 In addition, the respondent's brief may raise grounds for affirming the lower courts, even if those grounds were not presented to the lower courts.  Liberty Trucking Co. v. DILHR, 57 Wis. 2d 331, 342, 204 N.W.2d 457 (1973) (appellate court may sustain the circuit court "on a theory or on reasoning not presented to the lower court").  This is "well-established law in Wisconsin."  Blum v. 1st Auto & Cas. Ins. Co., 2010 WI 78, ¶27 n.4, 326 Wis. 2d 729, 786 N.W.2d 78; see also State v. Delap, 2018 WI 64, ¶5 n.2, 382 Wis. 2d 92, 913 N.W.2d 175 (applying the rule where both parties had an opportunity to

3

brief the new grounds); <u>State v. Holt</u>, 128 Wis. 2d 110, 122-25, 382 N.W.2d 679 (Ct. App. 1985) (explaining the rule), <u>superseded by statute on other grounds</u>, Wis. Stat. § 940.225(7).[4]

¶84 We abide by the rule of forfeiture, but we acknowledge that concerns about judicial economy "are less relevant when new arguments are raised by respondents who seek 'to uphold rather than reverse the result reached at trial.'" <u>Blum</u>, 326 Wis. 2d 729, ¶27 n.4. Again, we have the discretion to disregard arguments presented for the first time in a response brief. We have done so, for example, to prevent prejudice to the petitioner. <u>See, e.g.</u>, <u>Paynter v. ProAssurance Wisconsin Ins. Co.</u>, 2019 WI 65, ¶¶105-09, 387 Wis. 2d 278, 929 N.W.2d 113. Thus, a respondent would be prudent to assert alternative grounds for affirming the lower courts in its response to the petition for review.

¶85 While the rules governing a respondent's presentation of issues for this court's review seem clear enough, the court and the State in this case have stumbled over them.

---

[4] Rule 809.62(3)(d) and (e) "are intended to facilitate the supreme court's assessment of the issues presented for review, not to change current law regarding the application of waiver principles to a respondent." Judicial Council Committee Comment, July 2008, Wis. Stat. § (Rule) 809.62(3)(d), (e). The Comment specifically cites <u>State v. Holt</u>, 128 Wis. 2d 110, 125, 382 N.W.2d 679 (Ct. App. 1985) ("An appellate court may sustain a lower court's holding on a theory or on reasoning not presented to the lower court.") <u>Id.</u>

- CONFUSING CASE LAW

¶86 In recent years, the court has issued decisions ignoring Rule 809.62(3)(d) and making incorrect and confusing statements of law regarding the respondent's ability to argue alternative grounds supporting the court of appeals result. Two examples are State v. Sulla, 2016 WI 46, ¶7 n.5, 369 Wis. 2d 225, 800 N.W.2d 659 and State v. Smith, 2016 WI 23, ¶41, 367 Wis. 2d 483, 878 N.W.2d 135.

¶87 In Sulla, the defendant raised multiple issues in the court of appeals. The court of appeals reversed without deciding some of them. The State's petition for review did not raise the undecided issues. We granted the State's petition. The defendant filed a response brief arguing the undecided issues, but the court refused to address them because they were "not raised in the petition for review" and "[w]e did not order that any issues presented outside of the petition for review be granted and briefed." Id., ¶7 n.5 (emphasis added) (citing Jankee v. Clark County, 2000 WI 64, ¶7, 235 Wis. 2d 700, 612 N.W.2d 297).

¶88 Sulla erred by taking the rule requiring the petitioner to preserve issues in the petition for review and applying it to the respondent. Sulla also incorrectly relied on Jankee, which concerned petitioners who forfeited issues by not raising them in their petition for review. See 235 Wis. 2d 700, ¶7. Jankee did not address forfeiture by respondents. In addition, Sulla ignored Rule 809.62(3)(d), which provides that a

5

respondent "may" but is not required to file a response raising alternative grounds supporting the court of appeals' result.

¶89 Smith compounded the confusion. The defendant raised three issues in the court of appeals, and the court of appeals decided one of them. The state's petition for review preserved only the decided issue. The defendant did not raise the undecided issues in his response to the petition. After we granted review, the defendant argued the undecided issues in his response brief. The court refused to address them because: "[A]ll of these claims are not properly before us, as they were raised in neither the State's petition for review nor in Smith's response to the State's petition for review." Smith, 367 Wis. 2d 483, ¶41 (citing Jankee, 235 Wis. 2d 700, ¶7).

¶90 Smith appropriately considered whether the undecided issues had been raised in either the petition for review or the response. But Smith incorrectly applied a rigid rule: The failure to raise issues not decided by the court of appeals in either the petition for review or the response forfeits them. Smith ignored Rule 809.62(3)(d), which permits, but does not require, the respondent to identify alternative grounds supporting the court of appeals' result in his response to the petition for review. Smith also invoked Jankee incorrectly. Jankee did not involve, and does not govern, forfeiture by respondents. Smith should have stated (but did not) that the defendant was free to argue the undecided issues in his response brief, but the court had the discretion to disregard them.

6

¶91 In two recent cases, this court has cited Sulla and Smith placing its imprimatur on their erroneous statements of law. See State v. Sholar, 2018 WI 53, ¶49, 381 Wis. 2d 560, 912 N.W.2d 89; Security Finance v. Kirsch, 2019 WI 42, ¶11 n.3, 386 Wis. 2d 388, 926 N.W.2d 167. To prevent further confusion on this matter, the court should clarify that Sulla, 369 Wis. 2d 700, ¶7 n.5 and Smith, 367 Wis. 2d 483, ¶41 are incorrect for the reasons I have stated.

## III. APPLICATION

¶92 In this case, the State waited until its response brief to argue reasonable suspicion——an issue the court of appeals did not decide. The State argued that its strategy was permissible for two reasons. First, Wiskowski raised the issue below and in his petition for review. The State is correct. Wiskowski argued that the State lacked reasonable suspicion in his motion to suppress, his initial court of appeals' brief, and his petition for review. The State's response did not raise reasonable suspicion as an alternative ground for affirming the court of appeals as permitted by Rule 809.62(3)(d). That does not matter because Wiskowski himself preserved the issue under Rule 809.62(2)(a).

¶93 The State's second reason is the source of controversy. The State argues that under Rule 809.62(3m)(b)1. and Delap, a respondent may defend the court of appeals' ultimate result based on any ground whether or not it was ruled on by the lower courts. This prompted Justice Hagedorn's

7

concurrence, which argues that the State's reliance on Rule 809.62(3m)(b)1. is misplaced. The rule does not allow the State to assert an argument not raised below to support the same result. Justice Hagedorn's concurrence, ¶8. "That would require interpreting this common-sense procedural rule as overriding or abandoning the principle of forfeiture——a rule as old as the common law system itself." Id.

¶94 I agree with Justice Hagedorn that the State's reliance on Rule 809.62(3m)(b)1. is misplaced, but for a different reason. Rule 809.62(3m) governs petitions for cross-review. The State prevailed in the court of appeals. It had no adverse decision to challenge in a cross-petition. See Cynthia E., 172 Wis. 2d at 232. Instead, the State should have proceeded under Rule 809.62(3)(d).

¶95 On the other hand, I agree with the State that a response brief may raise alternative grounds for sustaining the court of appeals result. The State may do so even if the alternative ground was not raised in the lower courts. Holt, 128 Wis. 2d at 124-25. Like it or not, that is "well-established law in Wisconsin." Blum, 326 Wis. 2d 729, ¶27 n.4. But the respondent proceeds at its own risk. This court is not required to address arguments presented for the first time in a respondent's brief.

¶96 I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.

8

¶97 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting)*. Wiskowski was arrested and charged with operating a motor vehicle under the influence of an intoxicant and with a prohibited alcohol concentration that was nearly 10 times over his legal limit. In the middle of the day, Wiskowski placed his order at a McDonald's drive-through and then did not appear at the window to pick it up. He evidently fell asleep at some point between ordering and the pick-up window. Understandably, the McDonald's employee who found him slumped over the steering wheel was concerned and called the police. Law enforcement responded within a minute or so and ultimately determined that Wiskowski, who had been convicted three prior times for drunk driving, was again drunk driving. Well over his legal limit, he was charged a fourth time.

¶98 The entirety of the interaction with law enforcement at this traffic stop was just over eight minutes. Most likely, the average traffic stop is longer than this eight minute inquiry. But the majority concludes that the evidence against Wiskowski must be suppressed because the officer inquired a bit too long. Apparently, after Wiskowski explained that he fell asleep because he was tired, the police were no longer community caretakers and had to let him drive on. The majority does not say how long is too long, but they know it when they see it. The majority opinion addresses traditional community caretaker and extension of stop principles. The majority opinion also opines that the officer could not have had reasonable suspicion to believe Wiskowski was drunk driving. Under the totality of

1

the circumstances, the officer's conduct was reasonable. I dissent, because, among other things, this case does not develop the law and is at most error correction. Our court should not accept review merely to correct error.

¶99 Clearly, this court does not grant every petition for review.[1] Rather, we accept or deny cases based on evaluating the following statutory criteria:

> (a) A real and significant question of federal or state constitutional law is presented.

> (b) The petition for review demonstrates a need for the supreme court to consider establishing, implementing or changing a policy within its authority.

> (c) A decision by the supreme court will help develop, clarify or harmonize the law, and

> 1. The case calls for the application of a new doctrine rather than merely the application of well-settled principles to the factual situation; or

> 2. The question presented is a novel one, the resolution of which will have statewide impact; or

> 3. The question presented is not factual in nature but rather is a question of law of the type that is likely to recur unless resolved by the supreme court.

> (d) The court of appeals' decision is in conflict with controlling opinions of the United

---

[1] Jessie Opoien, The Wisconsin Supreme Court is headed for its lowest output term ever. A look behind the numbers, Milwaukee Journal Sentinel (May 10, 2024), https://www.jsonline.com/story/news/politics/2024/05/10/wisconsin-supreme-court-headed-for-its-lowest-output-term-in-history/73630399007/; Alan Ball, How Many Decisions Can We Expect in 2023-2024?, SCOWstats (Apr. 30, 2024), https://scowstats.com/2024/04/30/how-many-decisions-can-we-expect-in-2023-24/.

States Supreme Court or the supreme court or other court of appeals' decisions.

(e) The court of appeals' decision is in accord with opinions of the supreme court or the court of appeals but due to the passage of time or changing circumstances, such opinions are ripe for reexamination.

Wis. Stat. § (Rule) 809.62(1r).

¶100 Given these criteria, and the fact that the majority opinion engages in only "error-correction" and develops no new law, we should not have accepted review of this case. Rather than applying a "new doctrine," the majority merely applies "well-settled principles to [a new] factual situation." Both the circuit court and the court of appeals denied Wiskowski's motion to suppress.

¶101 We are not an error-correcting court.[2] We are a law-developing court.[3] It is the court of appeals which is charged primarily with error correcting. State ex rel. Swan v. Elections Bd., 133 Wis. 2d 87, 93-94, 394 N.W.2d 732 (1986)

---

[2] State ex rel. Davis v. Cir. Ct. for Dane Cnty., 2024 WI 14, ¶¶79-83, 411 Wis. 2d 123, 4 N.W.3d 273 (Ziegler, C.J., dissenting) (arguing case should be dismissed as improvidently granted because this court is not an error-correcting court and the case was not law-developing).

[3] See Cook v. Cook, 208 Wis. 2d 166, 188-89, 560 N.W.2d 246 (1997) (determining that the court of appeals' "primary function is error correcting" while "[i]n contrast, the supreme court's primary function is that of law defining and law development"); State v. Lee, 197 Wis. 2d 959, 970, 542 N.W.2d 143 (1996) ("The rules of appellate practice applicable to the court of appeals are not always applicable to this court, which functions primarily as a law-developing court."); State v. Schumacher, 144 Wis. 2d 388, 407, 424 N.W.2d 672 (1988) (stating the court of appeals is an error-correcting court while the supreme court is a law-developing or law-declaring court).

3

("The supreme court is primarily concerned with the institutional functions of our judicial system, while the court of appeals is charged primarily with error correcting in the individual case."). "This means that, unlike the supreme court, the court of appeals does not have a law-developing or law-declaring function." State v. Schumacher, 144 Wis. 2d 388, 407, 424 N.W.2d 672 (1988); see also id. (citing State v. Mosley, 102 Wis. 2d 636, 665-66, 307 N.W.2d 200 (1981) ("The court of appeals is an error-correcting court.")).

¶102 The majority opinion does not engage in law development. It restates established principles to a fact specific situation. The current law is (1) that officers can engage in community caretaking;[4] (2) that a traffic stop cannot

---

[4] See, e.g., State v. Brooks, 2020 WI 60, ¶23, 392 Wis. 2d 402, 944 N.W.2d 832; State v. Asboth, 2017 WI 76, ¶15, 376 Wis. 2d 644, 898 N.W.2d 541; State v. Matalonis, 2016 WI 7, ¶¶29-30, 366 Wis. 2d 443, 875 N.W.2d 567; State v. Blatterman, 2015 WI 46, ¶39, 362 Wis. 2d 138, 864 N.W.2d 26; State v. Gracia, 2013 WI 15, ¶¶14-15, 345 Wis. 2d 488, 826 N.W.2d 87; State v. Pinkard, 2010 WI 81, ¶14, 327 Wis. 2d 346, 785 N.W.2d 592; State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598; State v. Anderson, 142 Wis. 2d 162, 167-68, 417 N.W.2d 411 (Ct. App. 1987).

be unnecessarily extended;[5] and that an officer must have reasonable suspicion to stop a vehicle.[6]  The majority applies well-established law to the specific facts of this case.[7]

---

[5] I recognize that "[t]he temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment."  State v. Popke, 2009 WI 37, ¶11, 317 Wis. 2d 118, 765 N.W.2d 569 (quoting State v. Gaulrapp, 207 Wis. 2d 600, 605, 558 N.W.2d 696 (Ct. App. 1996) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996)).  Because a seizure implicates a party's Fourth Amendment rights, "[t]he scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983).  "[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification" for the stop.  Terry v. Ohio, 392 U.S. 1, 29 (1968).  "Authority for the seizure ends when tasks tied to the traffic infraction are——or reasonably should have been—— completed."  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See, e.g., Bies v. State, 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977) (determining that "any warrantless intrusion must be as limited as is reasonably possible consistent with the purpose justifying it in the first instance"); Rodriguez, 575 U.S. at 354 ("Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'——to address the traffic violation that warranted the stop[.]"); State v. Floyd, 2017 WI 78, ¶21, 377 Wis. 2d 394, 898 N.W.2d 560 ("Traffic stops are meant to be brief interactions with law enforcement officers, and they may last no longer than required to address the circumstances that make them necessary.").

[6] "An investigatory stop is constitutional if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed."  State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729 (citing State v. Waldner, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996)).  "An investigatory stop, though a seizure, allows police officers to briefly 'detain a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.'"  Id. (quoting Waldner, 206 Wis. 2d at 55).

¶103 While the United States Supreme Court recently considered the community caretaker warrant exception in Caniglia v. Strom, 593 U.S. 194 (2021), the majority does not rest its opinion on that case. Notably, the majority does not adopt that analysis, nor does it in any way alter the community caretaker exception to the warrant requirement. Perhaps it does not because the facts of Caniglia, which involved entry into a home, differ from those here——a vehicle stop. Indeed, while Caniglia may have further refined the community caretaker doctrine and some of my colleagues may wish to further consider the community caretaker doctrine in Wisconsin, the majority opinion merely applies previously accepted doctrine regarding an extended stop. See majority op., ¶¶2, 21.

¶104 Since this case turns on its facts, I briefly engage in an alternative legal analysis of those facts. Wiskowski placed an order in the McDonald's drive-through at about 1:00 in the afternoon. Wiskowski did not arrive at the pickup window. The McDonald's employee called the police to explain that someone had fallen asleep behind the wheel in the drive-through lane. Wiskowski placed his order and fell asleep before arriving at the pick-up window. Law enforcement arrived within a minute or so in response to the employee's call and witnessed Wiskowski pulling out of the parking lot into the street. It is

---

[7] See majority op., ¶2 ("The scope of caretaking stops should be guided and limited by justification for the stop. This means that, absent another permissible reason to detain someone, the detention must end when the original community caretaking function is resolved.").

6

undisputed that Wiskowski had fallen asleep after ordering food. It was not unreasonable for the officer to take a closer look.

¶105 Wiskowski was thereafter properly pulled over by law enforcement. Wiskowski explained that he fell asleep because he had been working 24 hours straight and was tired. However, that did not dispel the officer's belief that he might need some sort of assistance. While the officer did not immediately smell alcohol on Wiskowski's breath, the officer did eventually ask Wiskowski to step out of his truck, and Wiskowski stumbled as he did so. At that point, the officer did smell alcohol on Wiskowski's breath. Wiskowski admitted to having a couple of beers, a few hours before the stop. The officer took Wiskowski to the police station, administered field sobriety tests, and arrested him for fourth offense operating while under the influence of an intoxicant and operating with a prohibited alcohol concentration of nearly 10 times his legal limit of less than .02. Wiskowski was subsequently charged with fourth offense drunk driving.

¶106 I disagree with the majority's assertion that law enforcement did not possess reasonable suspicion in pulling over Wiskowski. Reasonable suspicion is a low bar: "[It] need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). "The essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances

7

present." State v. Richardson, 156 Wis. 2d 128, 139-40, 456 N.W.2d 830 (1990); see also State v. Popke, 2009 WI 37, ¶23, 317 Wis. 2d 118, 765 N.W.2d 569 ("[A] police officer may still conduct a traffic stop when, under the totality of the circumstances, he or she has grounds to reasonably suspect that a crime or traffic violation has been or will be committed.") (citing State v. Gaulrapp, 207 Wis. 2d 600, 605, 558 N.W.2d 696 (Ct. App. 1996)). The test is reasonableness. An analysis of reasonable suspicion asks "whether the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." State v. Post, 2007 WI 60, ¶13, 301 Wis. 2d 1, 733 N.W.2d 634 (citing State v. Anderson, 155 Wis. 2d 77, 83-84, 454 N.W.2d 763 (1990)). While an officer's "inchoate and unparticularized suspicion or hunch" is not enough to satisfy reasonable suspicion justifying an investigative stop, id., ¶10, "officers are not required to rule out the possibility of innocent behavior before initiating a brief stop." State v. Genous, 2021 WI 50, ¶8, 397 Wis. 2d 293, 961 N.W.2d 41 (quoting Anderson, 155 Wis. 2d at 84). "Therefore, if any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry." State v. Young, 2006 WI 98, ¶21, 294 Wis. 2d 1, 717 N.W.2d 729 (quoting Anderson, 155 Wis. 2d at 84)).

8

¶107 Under the facts of this case, law enforcement responded to a named informant's call about a driver asleep behind the wheel of his vehicle, in a McDonald's drive-through, in the middle of the day. Law enforcement arrived shortly thereafter on scene and observed a vehicle matching the named informant's description, exiting the drive-through. The driver, who according to the named informant had been sleeping a moment prior, was now operating his vehicle out of the parking lot and back into traffic. Law enforcement was not required to "rule out the possibility of innocent behavior" or make "other innocent inferences" to explain this unusual behavior. Genous, 397 Wis. 2d 293, ¶8; Young, 294 Wis. 2d 1, ¶21. Rather, the officer based his decision to initiate a traffic stop on the "totality of the circumstances" present at the time. Reasonable suspicion demands no more.

¶108 The majority seems to make much of the fact that the officer testified that he did not initially smell the odor of intoxicants and somehow the stop lasted a bit too long. Majority op., ¶¶5-6. The majority rests its community caretaker conclusion on the officer asking and requiring too much of Wiskowski in his exchange with him, extending the stop beyond what is necessary for the community caretaker function. Id., ¶25. The majority sheds little light on what rule law enforcement should follow in the future other than the Wiskowski stop was a bit too long. Id., ¶2. In other words, this case is very fact-dependent.

9

¶109 If the officer testified that he stopped the vehicle for a traffic violation, such as Wiskowski not using a turn signal, the majority analysis would likely be different. Officers also can base a vehicular stop upon a call from an informant, whether unknown, or as in this case, known.[8] If just a bit earlier in this stop the officer smelled intoxicants or witnessed slurred speech or stumbling, the majority likely would not reach the same conclusion. Here, the majority says, this information came to the officer too late even though it was within minutes. The majority essentially manufactures a two-part stop out of what is one continuous inquiry. This officer did not unreasonably extend this stop. The officer's observations occurred within a fairly short time period and his

---

[8] *See* *Navarette v. California*, 572 U.S. 393, 398-99 (2014) (concluding that a traffic stop based on tip from unknown 911 caller "bore adequate indicia of reliability for the officer to credit the caller's account"); *Alabama v. White*, 496 U.S. 325, 326-27, (1990) (holding officers were justified in conducting a traffic stop based off of an unknown informant's tip and "corroborated by independent police work"); *Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (concluding that an officer "acted justifiably" in responding to an informant's tip as "[t]he informant was known to him personally" and gave information "that was immediately verifiable at the scene"); *State v. Rutzinski*, 2001 WI 22, ¶¶37-38, 241 Wis. 2d 729, 623 N.W.2d 516 (holding that a tip from unknown informant observing erratic driving "provided sufficient justification for an investigative stop" as, among other things, the tip "reported contemporaneous and verifiable observations," and the allegations in the tip "could suggest to a reasonable police officer that [the driver] was operating his vehicle while intoxicated"); *State v. Miller*, 2012 WI 61, ¶5, 341 Wis. 2d 307, 815 N.W.2d 349 (concluding that "under the totality of the circumstances police acted reasonably when they conducted an investigatory stop of the vehicle" as the officers "had the requisite reasonable suspicion primarily based on the reliability" of an informant and his verifiable tip).

inquiry was reasonable under the circumstances. After all, the touchstone of the Fourth Amendment is reasonableness.

¶110 Also consider that any variety of other substances, which do not necessarily have an odor, can constitute "drunk driving" or operating under the influence of another drug. Operating a motor vehicle with any amount of these prohibited substances in one's system constitutes operating with a prohibited substance.[9] For example, a person could be driving illegally while having any amount of these prohibited substances in their system. Many prohibited substances are odorless, such as oxycodone, heroin, or tetrahydrocannabinol (THC). The fact that this officer did not initially detect of an odor of alcohol should not automatically dispel the officer, under these facts, from looking further into whether Wiskowski was otherwise unsafe

---

[9] Chapter 961 of the Wisconsin Statutes, referred to as the Uniform Controlled Substances Act, lists the standards and schedules of various prohibited substances as well as the correlated offenses and penalties. While Wiskowski was convicted for driving with a prohibited alcohol concentration, fourth offense, Wis. Stat. § 346.63 also forbids any person from driving or operating a motor vehicle while:

> (a) Under the influence of an intoxicant, a controlled substance, a controlled substance analog or any combination of an intoxicant, a controlled substance and a controlled substance analog, under the influence of any other drug to a degree which renders him or her incapable of safely driving, or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving; or

> (am) The person has a detectable amount of a restricted controlled substance in his or her blood.

§ 346.63(1)(a), (am).

11

to operate his motor vehicle. The majority opinion feels no need to address this fact.

¶111 Instead, the majority assumes without deciding that the traffic stop was conducted under the community caretaker exception to the warrant requirement. The community caretaker exception allows police to conduct a seizure without first obtaining a warrant. See State v. Pinkard, 2010 WI 81, ¶¶13-14, 327 Wis. 2d 346, 785 N.W.2d 592. Under the community caretaker exception the court must determine (1) whether a Fourth Amendment seizure occurred; (2) if so, whether the officer was acting as a bona fide community caretaker; and (3) if so, whether the public need and interests outweigh the intrusion on the individual's privacy. State v. Kramer, 2009 WI 14, ¶21, 315 Wis. 2d 414, 759 N.W.2d 598. In the case at issue, neither party disputed that there was a Fourth Amendment seizure, so the court of appeals focused on the other two elements of the test.

¶112 Regarding the second element——whether the officer was acting as a bona fide community caretaker——the court of appeals correctly concluded that there was an "objectively reasonable basis" to believe that a member of the public is in need of assistance. State v. Wiskowski, No. 2021AP2105-CR, unpublished order, at 4 (Wis. Ct. App. Mar. 15, 2023). See State v. Maddix, 2013 WI App 64, ¶20, 348 Wis. 2d 179, 831 N.W.2d 778 (stating that an analysis of whether police are engaged in a bona fide community caretaker function "requires us to determine whether there is 'an "objectively reasonable basis" to believe [that]

12

there is "a member of the public who is in need of assistance"'" (quoting another source)).

¶113 The court of appeals observed:

> [The officer] was called to the scene because of a report about a person sleeping in a drive-through in the middle of the day. This was not where one would fall asleep absent some substantial problem, including a potential medical issue, because one must maneuver a vehicle through the drive-through and interact with restaurant employees. Though [the officer] observed the truck turn out of the parking lot when he arrived, he still had an objectively reasonably basis to be concerned that the driver needed assistance or might not be able to safely drive the truck.

Wiskowski, No. 2021AP2105-CR, unpublished order, at 5.

¶114 The third element of the test——whether the public need and interests outweigh the intrusion on the individual's privacy——further supports the legality of the stop.[10] The balancing test employed militated in favor of there being a significant public interest in ensuring that drivers are able to safely operate their vehicles on public roads. I agree with the court of appeals' conclusion that by immediately stopping

---

[10] Courts consider the following "relevant considerations" when assessing the balancing act of the third element of the community caretaker test, namely:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, and degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Anderson, 142 Wis. 2d at 169-70 (footnotes omitted).

13

Wiskowski, the officer was able to check on his condition and mitigate the risk to public safety——and to Wiskowski himself.

¶115 The circumstances surrounding the stop do not demonstrate that the officer used a high degree of overt authority or force, nor was there an extensive intrusion into a private space. In fact, the average speeding or traffic stop would likely take about the same amount of time——perhaps more. In short, the officer had reasonable suspicion to stop Wiskowski, the officer was acting as a bona fide community caretaker, and the traffic stop was not unreasonably extended.

¶116 Unfortunately, our court's review of this fact-specific case fails to provide a clear rule for law enforcement. No law is developed. Long established law about reasonable suspicion is misapplied, even though its application to the case at issue should militate against suppression of the evidence. Under the totality of the circumstances, the officer's conduct was reasonable.

¶117 For the foregoing reasons, I respectfully dissent.